Statement of the Case.
MONROE, J.
Plaintiff sues for damages for personal injuries resulting from the alleged negligence of the motorneer of one of defendant’s street cars. Defendant denies the negligence charged, and alleges that plaintiff’s injuries are attributable to his own want of care. There was a trial before a jury, resulting in a verdict for plaintiff in the sum of $15,000, which was made the judgment of the court. Defendant has appealed, and plaintiff has answered, praying for an increase in the award. The facts, as. we find them from the evidence in the record, are as follows: Plaintiff at the date of the accident, was 38 years old, and for about two years had been driver of steam fire engine No. 19, which has its house on the riverside of Maple, 212 feet below Eern, and about 61 feet above Burdette, street. The house is set back about five feet from the property line, and has two front openings, provided with double doors, each door being five feet wide, and swinging outward. The upper opening is used.for the engine and the lower for the hose wagon, which latter is a heavy, four-wheeled, two-horse vehicle, carrying about 1,000 feet of hose. Defendant has two tracks on Maple street; the one nearer to the engine house being used by the down, and the other by the up, going cars.. The distance between the house and the nearer track is say 21 feet, 10 inches; the banquette being 9 feet 6% inches wide, and the distance between the curb and the track being 7 feet 6% inches. There is a slight downgrade between the engine house and the track, and the space is covered with planking to a width at the house and on the banquette of say 29 feet, widening between the curb and the track to 36 feet. When the doors of the engine house are thrown open, they can readily be seen from a point 150 feet above, and from a like distance below, by the motorneers. of approaching cars, and, as they are usually closed in winter, the fact of their being open, at that season is fair warning that some movement of the engine or hose wagon may be expected, and especially is that the-case when the approaching motorneer sees, them thrown open. The rule of the defendant company requires its motorneers to give the right of way to vehicles of the fire department, and to stop their cars when such *948 vehicles are approaching, and plaintiff offered to prove that defendant’s instructions were and are that the motorneers shall keep their cars under control in passing the engine house in question, for the reason that the engine or hose wagon may be expected to emerge at any time, but the testimony on that subject was objected to and excluded as irrelevant. At about 8 o’clock on the morning of February 6, 1906, plaintiff, having been ordered to hitch the engine horses to the hose wagon and take them to be shod, ■complied with the order to the extent that *(he and the pipeman), having hitched up the ’ horses, he took his position and strapped ■himself on the driver’s seat. The pipeman pushed open the doors, and, following them •as they opened, went forward to the track, .and raised his arms as a signal' to the approaching car, whereupon plaintiff, whose view of the car was cut off by the open door upon his left, assuming that the car or any .approaching vehicle would thereby be stopped, allowed the horses, which were prancing or .jumping, to move forward, obliqueing them slightly to the left as they cleared the doors, with a view of reaching the blacksmith shop by going in that direction. He then discovered that a car was coming very rapidly on the ■down track, and was threatening a collision, to avoid which he pulled the horses to the right in the hope of being able to get the wagon on the street between the track and the curb, and had partly succeeded in so doing when the car struck the left hind wheel ■of the wagon (one of the horses being then ■on the banquette and the other on the street), and drove the wagon forward some 15 or 20 feet, until it collided with a post situated on the edge of the banquette at a point about ’39 feet belbw the engine house, and between which and the seat of the wagon plaintiff’s left leg was jammed and badly mashed. It is admitted that after passing Fern street the car moved at full speed, with all the power on, until the motorneer became aware from the opening of the doors of the engine house or the signal of the pipeman, or both, that a vehicle was about to come out of the house. The motorneer testifies that, when he. got about 75 feet from the house, these doors were thrown open from the inside of the house, and drew his attention as he saw a man jump to the door and throw up his hand, and that just then a pair of horses shot out in front of him. The driver, he says, “had no chance to get over the track with the horses, but turned down, and, as he turned down, the car struck the wagon right up in the hind wheel, and hit it a glance blow.” He also testifies' that just as soon as the doors attracted his attention he threw off the power, pulled the reverse back, fed the (reverse) power, and, as quickly as he could, applied the air brake, and he explains the fact that the car did not stop until it (the front end, which is 43 feet from the rear end) had reached a point say 100 feet below Burdette street, or more than 240 feet below the point at which the collision occurred, by saying that, after the wagon had been forced out of the way, the horses were frightened, and the situation was precarious, and he thought it wiser to allow the car to roll on (meaning that the brake was released, but that no power was applied) in order to open, or clear, the street.
The pipeman testifies that, when he reached the track and raised his hands in warning, the car was opposite the first house below Fern street, a point ascertained by subsequent measurement to be 144 feet above the engine house; that the motorneer was then looking off to his left, and did'not see him; that he ran forward until he was opposite the upper door of the engine house (thereby becoming obscured from the view of the plaintiff, who had not as yet emerged from behind the open, lower, doors), and attracted the attention of the motorneer by hallooing *950 to him, and that it was only then, when he was within 90 feet of the engine house, that the motorneer made any movement to stop the car. The witness further says (referring to the motorneer):
“He shut off his power, and, when he got in front of the door where the steamer is supposed to come out, he put on again his power, and he stepped back to the door, and then it struck the hose wagon and jammed it up against the post, and then the car stopped 127 feet from the post. That was the end of the car after the man was jammed against the post.”
Speyerer, a witness called by plaintiff, had alighted from an up-going car at the corner of Burdette street, and, having crossed over to the river side of Maple (and upper side of Burdette), observed through the side window of the engine house (only about 40 feet distant) that the apparatus was ready to go out. His attention was then attracted by the pipeman coming out and waving his hands and hallooing to the motorneer of the down-coming car, who, as he testifies, was then (when the pipeman waved his hands) about half a square (say 150 feet) above the engine house. The witnesses thus mentioned are the only ones examined whose testimony, as to the more material facts immediately connected with the accident we find worth considering.
The captain of fire company No. 19 was in the rear of the engine house at the moment of the accident, and his testimony is unimportant, save in so far as it relates to the condition of the rails of the car track. On that subject he says: That he observed the condition of the track and told the motorneer of car No. 316, “You have got no excuse. Look at the condition of the track.” Being asked: “What was the condition of the track,” he replied, “Dry.” The motorneer thus referred to was not called to deny that such a conversation took place, though he says that the rails were wet and slippery, which he attributes to dew. On the other hand, he testifies that the day was cloudy, that the accident occurred at 8:02, and he denies that there had been any fog. The conductor of car 316 had left the city when the case was tried, and was not examined. The motorneer and the conductor of car 301 (which was approaching at the moment when the doors of the engine house were thrown open, on the uptown track, and had reached a point probably 60 feet below the corner of Burdette street, or from 275 to 344 feet from car 316) undertake to testify as to the distance at that moment between car 316 and the engine house, and as to the exact movements of the motorneer of car 316, but, as they labored under the disadvantage of being a block, more or less, away, and of having in the case of the motorneer to see through the vestibule glasses of both cars, and for some purposes through the wood work of the vestibule of car 316, and in the ease of the conductor, who was at the rear end of car 301, of having also to see through the glass in the front door of his car, their testimony may be taken with some allowance. Moreover, the motorneer testifies that car 316 struck the hose wagon between the front and hind wheels; whereas, the one absolutely certain fact in the case is that it struck the left hind wheel of the wagon, which was broken by the blow. He testifies that the rails were wet, because the morning had been foggy, but the motorneer of car 316, as we have seen, swears that there had been no fog. He testifies that the motorneer of car 316 kept his air brake applied until his car stopped on the lower side of Burdette street, and that he did well, using his best efforts, to stop when he did, but the motorneer of car 316 swears that he “could have stopped right in the street, and blocked the street up,” but that, as soon as the accident had occurred, he released the air brake and allowed the car to roll on purposely, in order to open the street. He testified, without qualification, that a car, moving at full speed, cannot be stopped in less than 125 or 150 feet, and it was only after some cross-examination *952 by defendants’ counsel that he was brought to admit that the question may be affected by the speed at which the car is moving; the last question and answer being:
“Q. Under what circumstances could you stop under 120 feet?
“A. I would have to be going very slow.”
The motorneer of car 316, however, says that a car going at full1 speed can be stopped within 90 feet on a dry track. The conductor of car 301 testifies that, when the pipeman came out of the engine house and threw up his hands, his (the conductor’s) car was between 60 and 70 feet below Burdette street, and that it stopped with the rear end on the lower side of the street, from which, as the car was 43 feet long, it would 'appear that the stop was made in from 103 to 113 feet. Both he and the motorneer testify that, when the engine house doors were thrown open, car 316 was from 60 to 70 feet above the engine house, and they, as well as the motorneer of car 316, agree that the vestibule glasses were free of moisture, and that the air was cold.
Opinion.
From the facts stated, we conclude that the competent witnesses as to what took place just before and at the moment of the accident were Pinero, motorneer, Ziemer, pipeman, Speyerer, spectator, and Dole the plaintiff. Ziemer and Speyerer testify that, when the former first signaled, the car (316) was 144 or “about 150” feet above the.engine house, and we think, all the circumstances considered, that we must accept their testimony as true, since Dole plaintiff corroborates them by testifying that, when he emerged from the engine house and first saw the car, it was about 120 feet away, and the motorneer “was paying no attention,” from which we conclude that the motorneer did not at first see the open doors or the signal. We also accept as true the statement of Pinero that, when his attention was attracted, he shut off and reversed the power, and applied the air brake. We think he was mistaken in supposing that he saw the doors “opening” or the signal when first given.
Ziemer, as we have seen, testifies that Pinero, when about 90 feet from the wagon, shut off the power, but that he turned it on again, and stepped back into the door of the car, just as the car was about to strike the wagon. And Speyerer, testifying on that subject, says:
“If he shut it off altogether, I can’t say, but he made a motion with his hands, on the controller to shut it off, and he might'have started and tbrowed it back again. The power couldn’t have been shut off the car from the distance it went.”
Ferran, the motorneer of car 301, testifies that, as the doors of the engine house were opened, he saw Pinero applying his air brake; that, when he got near the hose wagon, he “pulled his reverse and threw his power on, and, by so doing, that his overhead flew off, and he was still using'his air all the while, until he landed on the other side of the street.” But, according to his own statement, at the moment that the doors were opened, he was occupied with stopping his own car, and we attach no importance to his testimony as to what Pinero was doing 240 feet away, with two vestibule glasses intervening.
It is, however, quite possible — even probable —that Ferran may have observed him as car 316 approached, and passed car 301, and, if his testimony is to be believed, Pinero was unable notwithstanding his best efforts (and accepting his statement as to his position when the doors of the engine house were opened) to stop his car until it had run a distance of about 300 feet. This we think improbable, and, upon the whole, we conclude that Pinero’s attention was first attracted when he was from 75 to 90 feet above the engine house; that he shut off the power, and, having reversed the switch or lever, turned on the power, and applied the brake; that the collision then occurred, and, that *954 the wagon having been driven out of the way, he released the brake; and that the car ran from acquired momentum to the place at which it was finally stopped, a distance of say 2.10 feet from the place of collision. In either case, however, and from his own admission that he was using all the power that he had, it is evident that he approached the engine house, a point of known danger, at the highest possible rate of speed, which, in our opinion was gross negligence. There is no doubt that the horses drawing the hose wagon followed pretty closely in Ziemer’s wake as he pushed open the doors of the engine.house and, going out to the track, signaled the car; but it need not have been too close for safety had it not been for the double negligence of the motorneer — first, in driving his ear at too high rate of speed; and, second, in failing to keep a proper lookout. Ziemer had the right to assume that the car would be under such control that the mortorneer would be able to stop it within 144 feet, or, if he should fail to see the signal immediately, within half that distance, or even less, and the blame for the accident should not be attributed to him because he did not realize that the car was being negligently operated, both as to speed and “look out.” ■ Plaintiff, on the other hand, acted upon the supposition that Ziemer’s signal to stop meant the stopping of the vehicle signaled to, and that, receiving no warning that it was not producing that effect, it was safe for him to drive on. It would have been more prudent no doubt for him to have waited until assured of the result of the action taken by Ziemer, but he was not legally at fault in failing to do so, since the action so taken should and would'have stopped the car but for the negligence of the mortorneer. It being important that the apparatus for its extinguishment should reach a fire promptly, and the men and horses of the fire department being expected and trained to use the utmost expedition for the accomplishment of that result, the requirement that individuals and vehicles engaged upon less pressing missions shall not only accord them the right of way, but should hold themselves in readiness to do so when they have reason to anticipate that the fire engines or hose carriages may appear, is not unreasonable, and that condition exists when a vehicle, more particularly a car, which is confined to its track, approaches a fire engine house situated in close proximity to such track. Defendant’s rule to that effect, if any exists, adds nothing to its obligations to the public; but we think the testimony offered on behalf of the plaintiff to show “that the captain * * * complained to the head of the railroad company about the manner in which those cars ran by their engine house, considering its proximity to the railroad track, and why some steps should be taken to make them more careful, and how the officials told him that the men were instructed to keep the cars under control when passing the place, for the reason that a hose wagon or other apparatus might come out on the track,” should have been admitted, as emphasizing the fact that Ziemer was authorized to assume that car 316 was under control when he signaled it, and would therefore be stopped in time to avoid collision with the out-coming hose wagon.
“If the city council fails to pass ordinances called for by existing conditions, the company should of its own motion make a regulation, * '* * and notify its employés, but the latter are held without notice to have knowledge of the visible, dangerous conditions, and bound, without specific direction, to take the steps necessary for the public safety.” Eichorn v. N. O. & C. R. Light & Power Co., 112 La. 237, 36 South. 335, 104 Am. St. Rep. 437 (syllabus).
Plaintiff sustained a compound, comminuted fracture of the bones of the lower part of the left leg. The bone of the left heel was crushed, and had to be removed. The left ankle is stiff, and will remain so; and altogether he is a cripple, for life. His physical suffering has been severe since it has been necessary that he should submit to sev *956 eral surgical operations, and. his mental suffering has been and will be not less so, as he was for some time in great danger of losing his life, and his status, as an active man, capable of maintaining himself and caring for his family, whether as to the necessities, or the enjoyments, of life, has been changed to that of a comparatively helpless dependent. The amount awarded by the jury is greater in proportion than this court has been in the habit of allowing; but, considering, as we are bound to do, that the purchasing power of money is less than it has been in the past, we are of opinion that there should be judgment for $7,500.
It is thereiore ordered, adjudged, and decreed that the verdict and judgment appealed from be reduced to $7,500, and, as thus amended, affirmed, the plaintiff to pay the costs of the appeal;
PROVOSTS’, J., dissents.