Statement of the Case.
MONROE, J.
Plaintiff sues for damages for personal injuries sustained whilst discharging his duty as “toggle knocker” in defendant’s employ. Defendant pleads assumption of risk, including risk of the negligence of a fellow servant, and contributory negligence.
The duty of the “toggle knocker” is to knock loose the “toggle” or “binder” chain, by which logs, loaded upon a ear, are held in position, so that they may be released and unloaded. An ordinary log car consists of two trucks, upon which are fastened, about 14 inches apart, two squared timbers, called “reaches,” 7 inches thick which extend from one truck to the other and hold them in their relative positions. Across the tops of the reaches and between the wheels of the car, are other timbers, called “bunkers,” 14 inches thick, upon which the logs are piled lengthwise of the car. The reaches are 18 inches above the ground, and between them the distance from the logs to the ground is 3& inches. The toggle chain passes from the reach, underneath one side of the pyramidal pile of logs, over the top of the pile, and is hooked to a short chain fastened to the reach underneath the other side of the pile; and, in order to disengage it, the toggle knocker must crawl under the car, and with a short-handled ax knock the hook out of the link or ring, constituting what may be called the “eye,” in the short chain. When the log train reaches its destination, the first thing to be done, in order to unload the logs, is to knock loose the toggle on each of the cars, and the toggle knocker is expected at once to proceed to the discharge of that duty, and to continue his work until all the toggles have been disengaged. In this instance, the destination of the train was a ramp, upon which about, say, five cars could be unloaded without further movement of the train, the logs, as taken from the cars, being rolled into an adjacent pond; and we infer from the testimony that plaintiff had knocked the toggles from, say, four cars that were on the ramp and were being unloaded, and was at work under the fifth from the locomotive, at the other end of the train, when he was injured.
He was lying at the time on his back under the reach to which, by means of the short chain, the toggle was hooked, and was trying to knock the toggle hook out of its eye; and, there being but 18 inches between the reach and the ground, he was not particularly attending to the position of his feet, one of which as it happened, was resting on one of the rails of the track, either against or quite near one of the wheels of the car, so that when, without warning of any kind, the train was backed his foot was crushed, and had soon after to be amputated. The testimony shows that the car moved about two feet, when it was stopped by reason of a signal given to the fireman, who was handling the locomotive, and plaintiff was asked how much nearer than two feet his foot was to the wheel, to which question, and some others, he replied as follows:
“I can’t say; I wasn’t looking at my foot. I was looking at this piece of work. * * * I couldn’t look at my foot and do the work at the same time. * * * They were supposed not to move until I got through, and in that way it is not dangerous. * * * A man goes under there; anybody who has done work before knows that it is easier for him to lay his legs out to do the work. * * * I suppose I would have [had room to spread his feet out, without putting either of them on the rail]; but, like I said a while ago, you get into all kinds of shapes, because you are not looking for the car to move. * * * Yes; it was dangerous in case the car should move [for him *69 to have his foot on the rail] ; but I wasn’t looking for them to move.”
Apart from any movement that may be caused intentionally by the movement of the locomotive, a car is sometimes caused to move by the vibration produced in relieving it of its load of logs, and we infer that such movement may be communicated to, perhaps, one or two of the nearer cars; and in such cases notice could hardly be given from the engine to the toggle knocker, as the person in charge of the engine would not himself be notified. Such movement does not, however, extend beyond from one to three inches, does not ordinarily take place when the car which is being unloaded is on a level track, and, as it appears to us, could readily be guarded against by chocking the wheels, either of the car from which the logs are being removed, or of that under which the toggle knocker is working. The car under which plaintiff was working did not move, and does not appear to have been in danger of moving, by reason of any movement resulting from the vibration of the car that was being unloaded at the moment of the accident. It moved because the fireman, who was in charge of the locomotive, upon a signal to that effect from the brakeman, caused the locomotive to move, and thereby moved the train; the purpose being to release one of the toggle chains which had already been knocked loose, but which had been fouled by a log in the process of unloading, and interfered with the work. Log trains are not unfrequently moved for that purpose, and they are also moved in order to clear the ramp of unloaded cars and place the loaded ones in position to be unloaded. So far as we can gather from the testimony of defendant’s witnesses, no instructions are given by defendant looking to the safety of the toggle knocker in the event of the movement of the car under which he may be working, whether the movement be intentional or unintentional, or whether it be a few inches, a few feet, or more. Mr. Cooper, defendant’s superintendent, seems to think, and so téstifies, that the toggle knocker may make himself perfectly safe by keeping his feet off the rails, and, in the event of any considerable movement of the car, by swinging himself up to the under side of the reach. He says (referring to the danger from the sand boards) that, if he (the toggle knocker) were a large man (i. e., so large that a sand board, extending down to within nine inches of the surface of the track, would not pass over him), and he did not swing himself up to the reach, or, being a smaller man, did not properly adjust his person upon the track, “seven to eight feet would catch him,” but that, for the purpose of releasing a fouled toggle, the trains are not moved more than three ¡or four feet. But Mr. Cooper has never knocked toggles, and Crowder, the engineer of the train on which plaintiff was working when injured, being examined as a witness for defendant, testifies as follows, in his examination in chief to wit:
“In unloading, the logs fall off on the skidder, and very often the chains catch between the log and the skidder, and the only way we can get them loose is to pull the engine, and that cuts the chains from underneath the logs. Q. About how much of the movement of the car does it usually take to loosen the chain, under those circumstances? A. I reckon 'six to ten feet.”
Mr. Crowder was not on the locomotive when the accident occurred, but had placed Kyle, the fireman, in charge of it, whilst he had gone back to the ramp to assist in unloading the logs. At the very moment of the accident, however, he was engaged in conversation with Mr. Cooper, the superintendent. He says that he saw Hopkins, the brakeman, signal to Kyle to back the train, and he endeavors to excuse himself for not interfering for the protection of the plaintiff by saying that he did not know that plaintiff *71 was then at work under one of the cars; that he thought he had had time enough to get through. The train was there, before his eyes, however, and showed for itself that some of the toggles had been knocked and others had not; and hence that the toggle knocker had begun and had partly completed his work, and, presumably, was still engaged at it beneath one of the cars upon which the toggle was not as yet knocked loose. The testimony of Mr. Oowder, on his cross-examination, reads, in part, as follows:
“Q'. You are an engineer. Before backing or going forward, oughtn’t the engineer to give a signal? A. It wasn’t customary. Q. Wasn’t that considered safe in unloading? A. We never do, unless we move way back; we blow three times. Q. Doesn’t he ring a bell? A. Sometimes the fireman does, if he is there. Q. Ought the train to be moved without some kind of a signal? A. I guess on the main line they are required to do so. Q. Why? A. That is all the instructions we get. Q. You don’t know why the signal is given? A. One is to notify any one that the train is about to move. Q. Why do you want to let them know? A. So they can get out of danger. The crew is supposed to know that they are about to move. Q. The brakeman is supposed to know without a signal? A. No, sir. Q. The men that don’t give signals and work, they are entitled to know? A. He should know that it is liable to move at any time. Q. He should have some kind of notice? A. Yes, sir. * * * Q. lie [Hopkins] knew that Henry Cross was under the car? A. I don’t know. Q. He ought to have known? A. I don’t know; he knew that they had to be knocked. Q. He knew that all of them hadn’t been knocked? A. I don’t know about that. Q. You knew they hadn’t? A. No, sir. Q. Why? A. Because I didn’t have to go and look at all of them. Q. When they knock the toggles, don’t it loosen it? A. Sometimes. Q. You wouldn’t have given the signal to move the train without first knowing .the toggle knocker was safe? A. Yes, sir. Q. You would have found out whether he was under there, wouldn’t you? A. Unless we knew he was under there, I didn’t look out 'for the toggle knocker at all. Q’. Didn’t pay much attention? A. No, sir. Q. To what extreme? A. When he . was supposed to be under rthe car, we looked out. Q. At that time, he was supposed to be under the car, was he not? A. He had got plenty time to get out; I thought he had. Q'. Now, I understand that you all, knowing that this man had to go under cars and do his work, that you did not pay much attention? A. I did. Q. Did you ever give a signal to move a train without knowing that the toggle knocker was out from under it? A. Yes, sir. Q. You would order a train moved, knowing that he was under there? A. I wouldn’t; no, sir. Q.. I understand that you wouldn’t give any order to move that train without either knowing that he was out from under it, or without his knowing that it was going to be moved? A. Why, if it is a time that he is supposed to be under there, I wouldn’t. Q. You had that much regard for the safety of the man you were working with. A. I did. Q. Any railroad man ought to have had that much regard for the safety of the man working with him? A. Don’t know. Q. líe ought to? A. I guess he did; yes, sir. Q. Oughtn’t the engineer or man in charge of the engine to have either rung the bell or blown the whistle 'before moving? A. I suppose it would have been proper to have blown the whistle. Q. Railroad men all over the world give some kind of a signal when they move a train, don’t they? A. They are supposed to give a signal.”
Kyle, the fireman (called by defendant), .testifies that he would not have moved the train if he had known that plaintiff was under the car; that he guesses (“I guess”) he ought to have been notified; that the brakeman ought to have known whether he was under the car, or not, before giving the signal to move. Hopkins, the brakeman by whom the signal was given (called by defendant), testifies that he did not know, when he gave the signal, that plaintiff was under the car; that he thought he was through with his work; that he thinks he had had time to get through; that he would not have given the signal if he had known he was still under the car. Being asked why he would- not move the train without giving the signal, even if the movement were to be only a few feet, he replied:
“I didn’t want to cripple anybody. I wouldn’t move it. It’s an easy matter. If the one under knows that it’s going to move, he can catch the reach; but if he didn’t know it— Q. What about the sand boards that hung down? A. Unless he was a large man, he could lay down; but I wouldn’t take any chances. Q. Now, a man ought to be warned, if he is under there, that the train is going to be moved, so he could get prepared? A. Yes, sir; it is necessary for the workmen to get the warning. Q. Where should this signal come from? A. From the engine. Q. Should the bell ring? A. Yes, sir; I think it should.”
*73 Plaintiff, at the time of the accident, was about 20 years of age, and had worked on railroads and about sawmills- probably from his twelfth or fourteenth year; but, until the engagement during which he was injured, he had never filled the place of toggle knocker, and had had no experience of its duties or dangers. It is true that he says that he had worked as “toggle binder” (the toggle binder hooks the toggle, and the toggle knocker unhooks it); but he did not have to get into the same constrained positions in that capacity, and it does not appear that there was the same likelihood or necessity for the movement of the car in the one case as in the other.
Plaintiff testifies that Lucas, whose place he took, told him to be careful and not get hurt, and that, if a car should happen to move, to get hold of the reach, and that would save him, but that he did not tell him why the cars were apt to move; nor does it appear that any one else told him, or that he knew why, or that it occurred to him that a ear might move a few inches by reason of the vibration resulting from the unloading from it, or from an adjacent car, of a load of logs. Mr. Smith, the pond foreman, advised him to chock the logs on the car before knocking loose the toggle, in order, as we infer, to keep them from rolling off prematurely, and, perhaps, catching him unawares, with some part of his person outside the rail. It appears that about a week before the accident he had been requested by Lucas to take his place as toggle knocker, and a few days later had gone to work in that capacity, with the approval of Mr. Merritt, the woods foreman, who had immediate supervision of the logging operations from the woods to the ramp, and of Mr. Rhodes, the main line engineer, who had charge of what is called the “main line logging train,” upon whose pay roll his name was entered, who had the power to discharge b¡>" and who instructed him that his duty was to stay at the ramp and knock toggles from any trains that came in, and, as we infer, in the intervals between trains, to clean the track and burn sand for the locomotives. Some of defendant’s witnesses say that it was also his duty to assist in unloading the logs, and that he might at times be called upon to go into the woods with the trains; but no one testifies that he was ever so informed, or that he was ever called upon, during the 5% days that intervened between the date of his employment and that of the accident, to perform such duties. In addition to the main line regular train, there appears to have been another irregular train, which, perhaps, obtained its supply of logs in a different territory from that in which the main line train operated, and which came into the ramp when a load was obtained, say, four or five times in a month, and it was that train, of which Crowder was engineer, and which had but one brakeman, whereas the regular train had two, on which plaintiff was working when injured. So far as' appears from the record, plaintiff had never received any instructions from Crowder, and was working under the instructions given by Rhodes, to go under the cars and knock the toggles from the trains as they came in; and no one participated with him in the knocking of the toggles, or had anything to do with that work, save to refrain from running the train over him whilst he was engaged in it. Upon the case as thus presented, the judge a quo gave judgment for plaintiff in the sum of $3,500. Defendant has appealed, and plaintiff has answered the appeal, praying that the amount of the award be increased.
Opinion.
[1] It is undisputed, or placed beyond dispute by the evidence, that plaintiff obeyed the instructions of his employer in going under the car in order to do the work for *75 which, he was employed; that he was in that position engaged in that work when, without warning to him, the car was moved and his foot crushed; that he went under the car with the distinct understanding on his part that the car would not be so moved without such warning; that his understanding of the matter was fully authorized by the existing conditions, and was shared in by those whom defendant had placed in control of the car, including plaintiff’s immediate superior, defendants’ vice principal, the. engineer of the train of which the car in question formed part; that the engineer, as well as the fireman and brakeman, knew that it was plaintiff’s duty to knock loose the toggle chains upon every car on the train, and had the evidence before their eyes that he was engaged in that work, as some of' the chains had been knocked loose and some had not; and, that, though the brakeman gave the signal which caused the ’caito. be- moved, the engineer was on the spot, saw the signal given, might have interfered to prevent its being acted on, but did nothing. It is clear, then, we think, that plaintiff did not assume the risk that the car would be intentionally moved, without notice to him, while he was under it, and that, quoad such risk, he was guilty of no contributory negligence in allowing his foot to rest upon the rail, or in assuming any other position that he found necessary or convenient for the doing of the work in which he was engaged. Whether he assumed the risk of such movement of the car under which he was working as might have resulted from the vibration produced by the unloading of the logs from another car on the same train is immaterial, since that was not the movement that caused the injury; nor can any one say that such a movement would have occurred, or, if it had occurred, that so slight a movement would have caused the injury. We may say, however, that, whilst it is shown that plaintiff was informed by the toggle knocker whom he succeeded that the car might be moved, and was advised that, in such case, he might save himself by swinging upon the reach, his admission upon that subject is coupled with the statement, which he repeats, that he was not looking for the car to move until he got through his work (meaning, as we understand his testimony, without notice to him), and, in the absence of any evidence to the effect that he was cautioned that the car might be moved without intention, and from the cause to which we are now referring, we. conclude that he was ignorant of that possibility. The remaining proposition upon which defendant relies is stated by its learned counsel as follows, to wit:
'Where a crew of men working for the same employer, under a common foreman, and carried on the same pay roll, are engaged in the work of hauling cars loaded with logs to a lumber company’s plant, and there unloading them, which crew consists of (1) an engineer, (2) a fireman, and (3) a brakeman, performing the usual duties attending such positions, accompanying the train to and from the woods, .and, in addition, discharging the duty of unloading the logs, and, of a toggle knocker, whose duties are to assist in unloading the logs, and, while the train is gone with the other workmen, to remain behind and to clean the track and burn sand, and the toggle knocker is injured, through the alleged negligence of the brakeman and fireman, during the process of unloading, and while all the workmen are actively engaged exclusively in unloading, the brakeman, fireman, and toggle knocker are fellow servants, quoad the work of unloading, and the toggle knocker cannot recover for the injury thus received in a suit against the common employer.”
The evidence shows that plaintiff was carried on the pay roll of Rhodes, the main line engineer, and, though there is nothing said on the subject, we infer that Kyle, the fireman, and I-Iopkins, the brakeman, of the train on which plaintiff was working when injured were carried on the pay roll of Crowder, the engineer of that train, who was, however, in control of the train and of the men actually working on it. As to plaintiff’s ( duties, he testifies that they were to *77 knock toggles on any train that came in— a function in which no one else participated • — and in the intervals between trains to clean the track and burn sand. Defendant’s witnesses say that the toggle knocker was considered a member of the train crew, and was expected, when needed, to assist in unloading logs, and at times to accompany a train to the woods; but no one pretends to say that plaintiff was ever so informed, or that he was ever called on to perform such duties; and, as the matter is presented, it appears to us that he occupied about the same relation to the engineer, fireman, and brakeman of the train upon which he was working as would a mechanic, employed to go under and repair a disabled automobile, to the owner and chauffeur.
We consider it immaterial, however, whether Kyle, Hopkins, and plaintiff were or were not fellow servants; for the act of negligence by which plaintiff was injured was done in the presence and to the knowledge and with the acquiescence of Crowder, the engineer, who was representing the defendant, and upon whom plaintiff had the right to rely for his safety. Bell v. Lumber Co., 107 La. 736, 31 South. 994; Towers v. Railroad Co., 37 La. Ann. 632, 55 Am. Rep. 508; Mattise v. Ice Co., 46 La. Ann. 1535, 16 South. 400, 49 Am. St. Rep. 356; Evans v. Lumber Co., 111 La. 534, 35 South. 736.
[2] Our conclusion upon the whole case is that the accident to plaintiff was attributable exclusively to the gross negligence of the defendant. Upon the question of the quantum of damages, we have recently held that, in view of the decrease in the purchasing power of money, $7,500 is not too much to allow a man who depends upon his manual labor for his livelihood for the loss, through the negligence of his employer, of a hand, and we are of the same opinion in regard to the loss by such man, and from a similar cause, of a foot.
. It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount thereby awarded to ‘plaintiff to $7,500, and that, as thus amended, said judgment be affirmed, at the cost of the defendant, in both courts.