Emilio Rojas et ux., Plaintiffs, Appellants, and Appellees, *v.*
E. D. Maldonado Sierra, Defendant, Appellee, and Appellant.

No. 9607. Argued April 6, 1948.—Decided May 25, 1948.

*E. Martínez Rivera* and *L. Blanco Lugo* for appellants- appellees.
*R. Rivera Zayas* and *G. Rivera Cestero,* and *Milton F. Rúa,* for
appellee and appellant.

Mr. Chief Justice Travieso delivered the opinion of the
Court.

The complaint in this case sets up two causes of action.
In the first it is alleged that the plaintiff spouses, parents of
Rafael Rojas Cosme, a child 4½ years old, on February 27,
1944, at 5:00 p.m., hospitalized said child in defendant's
clinic, to be submitted there to a treatment of his tonsils and
adenoids by Dr. José Picó; and that on the following
morning the defendant, unexpectedly and without the consent
and against the express will of the plaintiffs, "treated
the body of the minor Rafael Rojas Cosme, in a form and
manner unknown to the plaintiffs but with the result that the
minor died then and there." The second cause of action
is based on the claim that the intervention of the defendant,
besides lacking the consent of the plaintiffs, was negligent,
careless, and unskilful, thereby causing the death of the child.
The plaintiffs alleged that they had sustained intense mental
suffering and anguish, and prayed that the defendant be

adjudged to pay to them the sum of $20,000, plus $300 to cover the funeral and burial expenses, together with costs and disbursements, and $2,000 as attorney's fees.

As to the first cause of action, the defendant answered and denied each and all of the allegations thereof, and set up the following special defense:

That since 1943 the defendant had entered into a contract with the Teachers' Association, of which the plaintiff is a member, to render his professional services to the relatives of the teachers covered by the clinic plan of the association, said contract comprising all kinds of operations, among them, those for removal of tonsils and adenoids; that on February 26, 1944, the father of the child went to see the defendant and stated to him that he wished to hospitalize the child in defendant's clinic, in order that the defendant might operate immediately for the removal of the child's tonsils, as the latter were in a very bad condition; that the plaintiff informed the defendant that the child had been examined by Dr. José Picó, who was of the opinion that the operation was necessary and urgent, but that Dr. Picó could not perform the operation until a week later in the Presbyterian Hospital of Santurce; that the plaintiff stated to the defendant that, taking into consideration the urgent need of the operation and the savings which for him represented his resorting to the Teacher's Association plan, he preferred that the defendant perform the operation on the child, it being then agreed that the child would be hospitalized on the following day in order that the defendant could proceed to operate on him immediately after making the laboratory tests if the latter failed to show anything which would advise the postponement of the operation; that in accordance with the agreement, the child was hospitalized at 5:00 p.m. on February 27, 1944, and after he was examined by the defendant, who confirmed the necessity and urgency of the operation, and after the child was submitted to a general examination and to tests of his hemoglobine and of the time required for his blood to coag-

ulate, which examination and tests gave satisfactory results, the defendant proceeded to perform the operation on the minor in the morning of February 28, 1944, in accordance with the agreement with the plaintiff and without any objection on the part of the child's mother, who was present when the child was taken to the operating room; that the operation was satisfactorily performed by the defendant, without there being any hemorrhage or complication of any kind whatsoever during the operation; that the patient died, when he was about to be removed from the operating room, in consequence of a bulbar paralysis produced by the anaesthesia, this being an unfortunate occurrence, which did not involve any negligence or carelessness on the part of the defendant or his employees.

The defendant denied all the allegations of the second cause of action and set up, by way of special defense, besides the matter which he had set forth in connection with the first cause of action, that the operation was performed by the defendant with due skill and diligence, by taking all the advisable precautions in cases of this kind, and that the death of the child occurred after he was satisfactorily operated upon, without the defendant being chargeable in any way with negligence, carelessness, or unskilfulness.

The lower court rendered judgment sustaining the first cause of action, on the ground that the defendant had "operated on the child Rafael Rojas Cosme without the consent of his parents and the death of said child had resulted from said operation," and adjudged the defendant to pay to the plaintiffs the sum of $5,000 "for mental and moral anguish and physical suffering," together with costs and $500 as attorney's fees. The judgment did not contain any pronouncement as to the second cause of action. However, in the opinion which served as a basis for said judgment, the court stated its view that the evidence was insufficient to support the charge of negligence and unskilfulness against the defendant.

The plaintiffs thereupon requested that the judgment be reconsidered and modified to increase the amount of the award granted for ''the mental and physical anguish and suffering sustained by the plaintiffs.'' They argued that the court, upon fixing the award, undoubtedly took into account only the element of compensation for the moral and physical suffering of the plaintiffs ''and it did not stop to consider that under the inflationary condition prevailing in Puerto Rico said $5,000, insofar as purchasing power is concerned and as compared to the value of the dollar in normal times, is reduced to scarcely two thousand dollars ($2,000).'' Upon the reconsideration sought being denied, and feeling aggrieved by the judgment rendered, the plaintiffs appealed therefrom ''insofar as it dismissed the second cause of action and granted as damages on the first cause of action the sum of $5,000 and $500 as attorney's fees.'' The defendant also appealed.

1. We will consider first the appeal taken by the defendant, which is based on four assignment of errors that we will consider jointly.

The defendant-appellant contends that the lower court erred in sustaining the first cause of action after having reached the conclusion that it was not proved that the child had died in consequence of any fault or negligence of the defendant, since there was no causal connection between the alleged fact of operating without consent and the death of the child.

The first cause of action is not based on any claim that the defendant in performing the operation on the minor acted negligently or without the necessary skill to perform it successfully. It is based exclusively on the alleged fact that the defendant treated the body of the minor and performed the operation without the consent and against the express will of his parents, with the fatal result that the child died in consequence of the operation.

The contention of the defendant-appellant is, in short, that under our laws a surgeon, who without the consent and against the express will of a patient submits the latter to an operation, is not liable for the death of the patient as a result of said operation, unless it appears from the evidence that the surgeon lacked the necessary skill to carry it out successfully or that he acted negligently. The plaintiffs maintain that the lack of consent from the patient—or from the parents if a minor is involved—is sufficient by itself to render the surgeon liable for all the consequences of his interference with the body of the patient, without it being necessary to allege or prove that the surgeon lacked skill or that he acted without due care.

In passing upon the question thus raised, it is advisable to state that the trial court, after a careful analysis of all the evidence, held as proven the following facts:

1. "That Dr. E. D. Maldonado had no authorization, either from the father or from the mother, to operate on the child, since the latter was hospitalized to be operated on by Dr. Picó, and Dr. Maldonado confused the application for hospitalization with one for surgical service."

2. ".That Dr. Maldonado did not make any physical examination of the child either in the afternoon or in the evening of Sunday."

The evidence regarding the aforesaid facts was conflicting; but since the evidence introduced by the plaintiff and accorded credit by the court is amply sufficient to support the findings made, it is our duty to respect the latter.

According to our Civil Code, "illicit acts and omissions or those in which any kind of fault or negligence occurs" create the obligation to repair the damage caused thereby. Sections 1042, 1046, and 1802 of the Civil Code, 1930 ed. Section 60 of the Code of Civil Procedure, 1933 ed., grants to the parents the right to bring an action for the injury or death of a minor child, "when such injury or death is caused by the wrongful act or neglect of another."

Manresa, in his Commentaries on the Spanish Civil Code, referring to those obligations which arise independently of any contract, and especially those arising out of fault or negligence, says:

"Said obligations are based on an undisputable principle of justice acknowledged by all legislations . . ., according to which every wrong, damage, or injury affecting the rights of a person, whether by an act or omission, creates a legal relationship, which gives rise to the right on the part of the injured person to be compensated, and to the corresponding obligation on the part of the tort-feasor.

"  .    .    .    .    .    .    .    .    .    .    .

"According to the Code, they may arise from two different causes, which are fault and negligence, that is, they may be created by an act or omission, *since fault requires the performance of an affirmative act which causes an injury to a person other than the one who performs it,* and negligence, in its turn, presupposes an omission which produces the same result, although both have as a common element the fact that the act is done or the omission occurs without a wrongful intention, for if that element were not lacking, if the above-mentioned act or omission should involve a wrongful intention, then it would become a real crime or minor offense (*falta*), as the case might be, and would produce the corresponding penal and civil liabilities . . . When the fault or negligence does not lead to such a serious result, it nevertheless creates a civil liability, which is confined to the payment of compensation for the injury caused. . . .

"As stated by a textwriter, man should conform all his acts to the rules and precepts of prudence; and if by acting otherwise he causes injury to the person or property of another, he should repair the damage as far as it may be possible to do so. He caused the damage, although unintentionally, and he is therefore bound to duly compensate the person who suffered the injury. This is an obligation which arises from a fault that does not constitute a crime or minor offense.

"  .    .    .    .    .    .    .    .    .    .    .

"In other words, as stated by Mr. Sánchez Román, *the concept of fault carries with it the idea of a wilful denial of another person's right, whereby injury, damage, or offense is caused to such person;* but the violation of said right which causes damage or injury must be independent of any previous agreement, and this is why the fault is designated as *not contractual (extracontractual).* On the

other hand, in negligence there is not involved any positive act of the person liable therefor, nor any wilful act or intention, but merely a default in the duties of prudence, foresight, and alertness that the law imposes on him." Vol. 12, 2d ed., 1911, pp. 607–609.

Further on in said vol. 12, p. 613, commenting on § 1902 of the Spanish Civil Code, which is equivalent to § 1802 of our Code, Manresa says:

"The provision under discussion is based on an indisputable principle of equity, and the rule established therein constitutes a maxim of universal jurisprudence, inasmuch as fault should properly affect only its author and the consequences thereof should not be borne by the person who, without the intervention of his will or any cause on his part, is made the victim of such fault or suffers the damage caused thereby."

It may be seen, therefore, that the obligation to repair the damage caused to another person may arise from the mere execution of a positive and wrongful act, without it being necessary to allege or prove that the person causing the damage acted without due care, that is, negligently.

What was the positive and wrongful act executed by the defendant? The act of operating the child without the consent and against the express will of his parents. The latter were entitled to choose the surgeon in whose hands they were going to place the health and the life of the child. The mere fact that the defendant was a physician authorized to practice medicine and surgery, did not entitle him to interfere with the body of the child or to perform the operation without the previous consent of his parents. Upon interfering and performing the operation, which was to be performed by Dr. Picó, without first obtaining the consent of the parents of the minor, the defendant executed a positive and wrongful act which involved a wilful and inexcusable denial of the right that the plaintiff parents had to choose the surgeon who was to operate on the child. In acting without the authorization of the parents, that is, wrongfully, the defend-

ant committed a tortious act or Aquilian fault, which rendered him responsible for the consequences of his conduct, and he was legally bound to repair the damage so done.

■ We agree with counsel for the defendant-appellant, and with the numerous textwriters cited by them, that in order that an action for damages may prosper it is necessary that there should be a causal connection between the damage or injury and the fault complained of. The evidence, to which the trial court accorded credit, shows the existence of such a relation in the instant case, since there is no doubt that the child would not have died on February 28, 1944, if the wrongful intervention of the defendant had not taken place. The situation would be different if the death had occurred after the intervention of Dr. Picó, who had been contracted and authorized to operate on the child, for in such case the surgeon is liable only if the death has been caused by his negligence or unskilfulness.

■ The general rule laid down by the American state decisions is that the relationship between a physician and his patient is a consensual one, and in the absence of an emergency or unforeseen events, a physician or surgeon must first obtain the consent of the patient, or of some one legally authorized to give it on his behalf, before subjecting him to any treatment or operation. It has been held that the consent of the patient is necessary in order to authorize a surgeon to perform an operation on the body of said patient, and that an operation performed without such consent is a tortious and illegal act which renders the surgeon liable for any damages caused to the patient.[1] In *Moss* v. *Rishworth*, 222 S. W. 225 (Tex. 1920), the tonsils and adenoids were removed from a child who died as a result of the operation, which was performed without consulting the parents of the minor. The

---

[1] Annotations in: 41 Am. Jur. p. 220, § 108; 76 A.L.R. 562; 50 L.R.A. (N.S.) 880; *Wall* v. *Brim*, 138 F. (2d) 478 (C.C.A. 5, 1943); *In re Hudson*, 126 P.(2d) 765 (Wash. 1942); *Jackovach* v. *Yocom*, 237 N. W. 444 (Iowa 1931).

defendant physician alleged that he had been authorized by two sisters of the child and that he assumed that they had authority to give the consent for the operation. It was held:

" . . . The sisters were but the temporary custodians of the child, and as such temporary custodians had no authority to give consent to perform the operation in the absence of an emergency. The parent was the only one who could legally give consent to perform it, and, if not given, the physicians' act in performing it was a legal wrong. If performed without the consent of the parent, it would amount to a technical assault for which the child could have recovered had she survived the operation, . . .

" . . . The law wisely reposes in the parent the care and custody of the minor child, and neither a physician nor those in temporary custody of the child will be permitted, in a case of this character, to determine those matters touching its welfare."

See *Hively* v. *Higgs,* 120 Or. 588 (1927), 53 A.L.R. 1052; *Browning* v. *Hoffman,* 90 W. Va. 568 (1922), 111 S. E. 402 (W. Va., 1922).

The lower court did not err in sustaining the first cause of action.

2. We now turn to the appeal taken by the plaintiffs. It is based on nine assignments of error, which may be reduced to the following three:

(1) In refusing to sustain in the second cause of action.

(2) In not adjudging the defendant to pay the funeral and burial expenses of the child.

(3) In granting to the plaintiffs an award of only $5,000, plus $500 as attorney's fees.

■ (1) We do not deem it necessary to state in detail the evidence introduced by the plaintiffs in support of this alleged second cause of action. The lower court, who saw and heard the witnesses testify, after making a careful summary of all the evidence which tended to establish the negligence or unskilfulness of the defendant, reached the following conclusions:

(*a*) "There is nothing in the surgical technique employed by Dr. Maldonado—and .in this all the experts agree. . .which would afford any basis for charging him with any surgical negligence"; and "there is nothing in the evidence which would permit us to reach the conclusion that the personal examination made by the surgeon contraindicated in any way the operation."

(*b*) "The impression remains in the mind of the trial judge that, in this unfortunate case of the Rojas child, there really may have existed a special physiological condition which made him a propitiatory victim of the anaesthetic itself, or that is a case in which, by a mystery of human nature, the child died due to a factor which could not have been determined from laboratory tests or from the examination of the patient."

(*c*) "We cannot, therefore, reach the conclusion that the Rojas child in this case died in consequence of any negligent act, unskilfulness, or inexcusable carelessness of the surgeon who performed the operation."

After a careful examination of the transcript of the evidence, we are of the opinion that the foregoing conclusions as to the second cause of action are justified, and that, therefore, the lower court did not err in dismissing said cause of action.

■ (2) The evidence introduced by the plaintiff as to the funeral or burial expenses involved, even if it could have been more clear and specific, is, in our judgment, sufficient to justify an award on that account. The plaintiff testified that he had spent "$300, more or less," in the wake, funeral, and interment of the child; that he paid the funeral car to carry the body from Río Piedras to Corozal and paid for the coffin, the grave, and for the digging of said grave; that he did not ask for any receipt in connection with these expenses. Said evidence was not controverted by the defendant nor does it appear from the record, that it was not believed by the trial court. The latter erred in not adjudging the defendant to pay those expenses or, at least, a reasonable amount if in its judgment the sum claimed was excessive.

■ (3) The plaintiffs challenged as insufficient the award of $5,000 granted on the first cause of action. They argued that the lower court erred in not taking judicial notice of the inflationary conditions existing at the time of the rendition of the judgment, when "the purchasing power of the dollar had been reduced to such a point that $2.04 was now required in order to buy something which in 1939 could have been purchased for one dollar." They alleged that the purchasing power of the $5,000 granted is only $2,500.

The humane and just intent of the law is to afford fair compensation to a person who has suffered wrong. Said compensation should have a real and effective value and not a fictitious one. Hence, it would not be proper to say that the same amount of money affords the same compensation when money is cheap as when money is dear. Bearing in mind that the dollar as a unit for the measurement of values is a fluctuating and variable criterion, political economists have devised a unit of measurement which, while also imperfect, is more accurate than the dollar for gauging values. That unit of measurement is the purchasing power of the dollar, which is ascertained by taking the money cost of certain essentials of life such as rent, clothing, food, and fuel, during a given period of time, and comparing it with the cost in money of those essentials during an antecedent period of like duration. This shows that the real and effective value of money lies not in what it is, but in what it will buy.

Applying those principles to the case under its consideration, the Supreme Court of Missouri, in *Hurst* v. *Chicago B. and Q. R. Co.*, 219 S. W. 566 (Mo. 1920) expressed itself thus:

" . . . It follows that if $10,000 was fair compensation in value for such injuries as are here involved 20 years ago, when money was dear and its purchasing power was great, a larger sum will now be required, when money is cheap and its purchasing power is small. How much larger will depend upon the difference in value (that is,

in purchasing power) of money now and then. That money to-day has much less purchasing power than it had 20, or even 10, years ago admits of no dispute, and we are not justified in disclaiming judicial knowledge of a world-wide condition, seen and known of all men everywhere. If that be true, then if we to-day allow the same amounts in money that we allowed in like instances 10 or 20 years ago, we are following our decisions of that day in letter, but departing from them in spirit.''

See *Meléndez* v. *Metro Taxicabs Co., ante,* p. 709; *Washington & Rockville R. Co.* v. *La Fourcade,* 48 App. D.C. 364 (1919); *Eckels* v. *Edison,* 139 Ill. App. 75, 81; *Cross* v. *Lee Lumber Co.,* 130 La. 66, 57 So. 631; *Dole* v. *New Orleans Ry. & Light Co.,* 121 La. 945, 46 So. 929; *Rogers* v. *Hiram J. Allen Lumber Co.,* 129 La. 900, 57 So. 166.

Taking into consideration the economic conditions prevailing at the time of the rendition of the judgment appealed from, and the actual low purchasing power of the dollar, we are of the opinion that the sum of $5,000 awarded to the plaintiff for the physical and mental suffering sustained in consequence of the unexpected and tragic death of their child, is not a sufficient compensation and that the same should be increased.

The judgment appealed from will be modified to adjudge the defendant to pay to the plaintiffs the sum of $10,000 for their mental and moral anguish and physical suffering, plus the sum of $200 as funeral and burial expenses of the child, together with costs and $1,000 as attorney's fees; and, as thus modified, the judgment is affirmed.

Mr. Justice De Jesús did not participate herein.