## CHARLESTON.

George F. Browning v. C. S. Hoffman *et als.*

Submitted March 7, 1922.　Decided March 21, 1922.

1. Physicians and Surgeons—*Evidence Held Not to Prove Negligence of Physicians or Nurses.*

In an' action to recover damages for alleged malpractice by physicians and surgeons operating a private hospital in which the plaintiff was treated for a serious wound of the leg, developing gangrene  rendering amputation necessary, within forty-eight hours after it was properly dressed and the broken bones set, and in the temporary absence of the attending physician, but while the patient was attended by competent nurses and the hospital by an assistant physician and surgeon competent in all respects, whom  the  nurses where instructed to call, if necessary; evidence to the effect that the leg was gangrenous to the knee and discolored for a space of two or three inches above the knee at 2 or 3' o'clock P. M. of the second day, and that, in the opinion of a physician who saw it then, it could not have been in good condition at 10:30 A. M. of that day, taken in connection with proof that, in the morning, there was evidence of lack of circulation but no constriction nor gangrene, that efforts by approved methods, on the part of the nurses and assistant physician, to restore or increase circulation, had been constantly made throughout the forenoon and development of the trouble carefully watched until 2:30 P. M., does not appreciably tend to prove negligence on the part of the attending physician, in temporarily leaving the patient, or providing for his care and emergencies in his absence, nor on the part of the nurses and assistant physician, in respect of care and treatment of the patient, and an instruction  assuming the existence of evidence appreciably tending to prove liability on such grounds, under such circumstances, cannot properly be given.　(p. 573).

2. Same—*Physicians Held Not Liable for Mere Errors in Judgment.*

Nor, assuming that the operating physician, before leaving late in the evening of the first day, visited the patient, or should have done so, and, if he did, saw or should have seen the chart disclosing a slight rise in  temperature,  pulse  and respiration, could the court properly instruct the jury, upon that fact and the nature of the wound that he was negligent

in temporarily absenting himself on a business mission, because such facts, taken in connection with the later· developments, constitute no appreciable evidence of such negligence. A physician is not liable for mere errors of judgment. (p. 578).

3.   SAME—*Unqualified Instruction That it Was Hospital Physician's Duty to Notify Parents Promptly of Necessity of Operation Held Error.*

If, in such case, it is shown that, when the necessity of amputation became certainly known at 2:30 o'clock P. M. of the second day, efforts were made to apprise the parents of the patient, a young boy, of the situation and obtain their consent to amputation of the leg, by the assistant physician, but that the father was absent and the mother not found for several hours thereafter, and that, when notified, she protested against operation without the assent of her husband who did not return until 9 o'clock P. M., and who, upon his return, refused to permit the assistant physician to perform the operation, it is error to instruct the jury unqualifiedly that it was the duty of· the assistant physician promptly to notify the parents or grand-parents of such necessity, the grandmother who was at the hospital not being shown to have had any authority to assent to the amputation, and it not being known to the  physician,  that  the boy resided with his grandparents. (p. 579).

4.   SAME—*Facts Held Not to Show Negligence on the Part of Nurse.*

A nurse left in charge of a patient suffering from a compound comminuted fracture of the leg, by the operating surgeon, after the bones have been set and wired and the leg enclosed in a plaster of paris cast, with instructions to watch the patient carefully, during the temporary absence of such physician, and, in case of swelling, to cut the cast, and, if necessary, call an assistant physician on the staff of the hospital in which the patient is, both physicians being on that staff, is not negligent in awaiting the coming of the assistant within two or three hours, on his regular tour of the hospital and visitation· of patients, after having cut the cast, resorted to appropriate treatment, on discovery of unfavorable symptoms, and vainly endeavored to communicate with him by telephone, it being within her province to determine the necessity of his attendance, in point of time, and the jury cannot properly be instructed, in such case, to find for the plaintiff, on the theory of negligence on the part of the nurse, in failing to call the physician at once, by messenger. (p. 581).

5. SAME—*Facts Held Not to Show Negligence in Failing to Discover Gangrene Sooner.*

If, on discovery of indications of lack of sufficient circulation in a leg so injured, dressed and treated, on the morning of the second day, the cast is cut at 8 o'clock, A. M., external heat applied to stimulate circulation, the bandages cut and the leg exposed and examined by the assistant physician, at 10:30 o'clock A. M. and the treatment continued and gangrene discovered at 1 or 2 o'clock P. M., failure of said physician to completely remove the cast and bandages for the purposes of inspection, count the pulse and note it, take the patient's temperature, make inquiry of the nurses, as to his condition during the preceding night, and read medical books, does not justify the giving of instructions submitting hypotheses of negligence in failing to discover necessity of amputation on the morning of that day, since such facts and circumstances do not constitute appreciable evidence of such negligence. (p. 583).

6. TRIAL—*In Malpractice Action for Not Sooner Amputating a Gangrenous Leg, An Instruction Ignoring Evidence of Delay Caused by Patient's Parents is Erroneous.*

If, in such case, there is evidence tending to prove that amputation at or slightly above the knee would have sufficed, if effected immediately after discovery of gangrene, and that delay necessitated amputation at the hip, instructions to find for the plaintiff, upon the theory of negligence in delay of amputation, hypothetically given, but ignoring evidence tending to prove unwillingness of the parents of the patient, a young boy, to permit amputation by the assistant physician, the only competent person then present, that had right to perform the operation, under the rules of the hospital, and efforts to find the parents and apprise them of the necessity of amputation, are erroneous. (p. 585).

7. PHYSICIAN AND SURGEON—*That Surgeon, 34 Hours After Dressing Wound, Temporarily Absented Himself Held Not Abandonment of Patient or Breach of Contract.*

Proof that a surgeon, after having properly dressed a wound and found it in apparently good condition twenty-four hours later, temporarily absented himself, on business, leaving the patient in the care of competent nurses and a competent assistant physician and surgeon, constitutes no evidence of abandonment of his patient or breach of his contract, and does not justify an instruction based upon the theory of such abandonment or breach. (p. 585).

8.  TRIAL—*Instruction on Weight of Testimony of Expert and Nonexpert Witnesses Approved.*

    Although in may instances the evidence of expert witnesses is entitled to much greater weight than that of non-experts, the jury are presumably as thoroughly cognizant of the fact as the court, it being one of common knowledge, wherefore there is no impropriety in the giving of an instruction, in a case in which the issue is largely dependent upon expert testmony, advising the jury to consider it and all of the other evidence and give it such weight as they think it is entitled to, and, further, that its value depends upon the circumstances of each case, to be ascertained by them.  (p. 586).

9.  NEW TRIAL—*Evidence Held to Warrant Setting Aside Verdict for Plaintiff.*

    Under the facts and circumstances here indicated, it is the duty of the trial court, upon request, to give an instruction directing the jury to find for the defendants, and, failing so to do, to sustain a motion to set aside a verdict found in favor of the plaintiff.  (p. 587).

10.  TRIAL—*Court Need Not Repeat Instructions.*

    A trial court is under no duty to repeat its instructions to the jury.  (p. 588).

11.  SAME—*Refusing a Binding Instruction Which Would Base Verdict Upon an Inclusive Fact is Not Error.*

    There is no error in the refusal of a binding instruction which, if given, would make the verdict turn upon an inconclusive fact, if found under submission of an issue as to it. (p. 588).

12.  WITNESSES—*May Not Testify as to Matters Beyond Personal Knowledge.*

    A witness is not entitled to testify as to matters of which he has no personal knowledge. (p. 588).

13.  APPEAL AND ERROR—*Party May Not Complain of Answer Responsive to His Own Question on Cross-Examination.*

    A party cannot complain of admission of an answer responsive to a question propounded to a witness, by himself, on cross-examination.   (p. 588).

14.  PHYSICIANS AND SURGEONS—*On Issue of Delay in Operation it is Permissible to Show That Hospital Rules Forbade Outside Physicians Operating Therein.*

    Upon an issue as to injury by delay in performance of a surgical operation in a private hospital, when a physician

not connected with it might have operated promptly, it is permissible to prove that a rule of the institution forbade operation therein by surgeons not connected with it. (p. 588).

15.  EVIDENCE—*On Second Trial Preserved Testimony of Witness at First Trial is Admissible on Proof that he Has Since Left the State.*

In a second trial of a civil case, the preserved testimony of a witness in the first trial is admissible on proof that he has since left the state and his attendance cannot conveniently be procured. (p. 588).

16.  SAME—*Expert's Testimony is Not Rendered Inadmissible Because of Variance from His Former Testimony or That of Other Experts.*

Variance of the testimony of an expert witness in a second trial from his evidence in the first and from that of other experts, if any in either respect, does not render it inadmissible (p. 588).

17.  PHYSICIANS AND SURGEONS—*Surgeon May Prove Custom of Having Assistant Called in Case of Necessity and Assistant's Competency.*

On an issue as to negligence on his part, a surgeon of a hospital having an assistant, may prove his custom to have the assistant called, in case of necessity, in his temporary absence, and also facts tending to prove the competency of the assistant, by his own evidence and the hospital records, even though it is admitted in the general sense of the term, "competency." (p. 588).

18.  WITNESSES—*A Witness May Refresh Memory from a Document Made by Another from Data Furnished by Witness in Course of Business.*

A witness may refresh his memory from a document made by another from data furnished by him, in the usual and ordinary course of business. (p. 589).

19.  EVIDENCE—*Upon Issue Whether Gangrene was Caused by Constriction of Bandages or by Infection, Experts Testimony as to the Time the Former Would Prove Fatal is Admissible.*

Upon an issue involving an inquiry as to whether a case of gangrene was produced by constriction of bandages or by gas-bacillus infection, the opinion of an expert as to the time in which gangrene of the former kind would ordinarily prove to be fatal, is admissible. (p. 589).

Error to Circuit Court, Mineral County.

Action by George F. Browning, infant etc., against C. S. Hoffman and others. Verdict and judgment for the plaintiff and the defendants bring error.

*Reversed and Remanded.*

*C. O. Strieby, Chas. N. Finnell, H. P. Whitworth,* and *Harry G. Fisher,* for plaintiffs in error.

*R. A. Welch* and *Taylor Morrison,* for defendant in error.

POFFENBARGER, PRESIDENT:

By reference to 86 W. Va., 468, the nature of this case, the history of the transaction out of which it arose and the general character of the evidence, will be found in the report of the disposition of a former writ of error in it. This writ has brought up for review, a judgment for $5,000.00, rendered upon a verdict found in a second trial in which the evidence was substantially the same as that adduced in the first. In some relatively unimportant respects, it differs, and some, if not all, of the variations therein will be incidentally noted in this opinion.

Exceptions were taken to the giving of each one of the twelve instructions given to the jury at the instance of the plaintiff, and each one of these exceptions is made the subject of a special assignment of error in the brief. Having set the broken limb and properly dressed the wound, late in the evening of November 11, 1918, Dr. Hoffman, the surgeon in charge of the plaintiff, left Keyser in the evening of the next day, and went to the City of Huntington, West Virginia, on an important public mission. He was absent during the night of the 12th, and the day of the 13th, and returned to Keyser, after midnight of the 13th, namely, at 2 o'clock A. M. of the 14th. During his absence, a crisis arose. He had left the patient in the hands of admittedly competent nurses, with such instructions as he deemed necessary. The hospital in which the patient was, belonging to the defendants, Drs. Hoffman and Kalbaugh, was attended in his absence, by Dr. Maxwell, an admittedly competent physician and surgeon. At 7 o'clock, on the

morning of the 13th, the head nurse discovered a coldness
and whiteness of the toes and possibly some swelling, but
she did not cut the plaster of paris case until an hour later.
At 10:30 o'clock, A. M., Dr. Maxwell, in making his usual
tour of the hospital and visiting the patients, came into the
room and was advised of the unfavorable indications. He
swears that, at that time, it was impossible to tell what ulti-
mate exigency or condition the unfavorable symptoms be-
tokened. Before his arrival, the head nurse had adopted
measures for increase or restoration of circulation and he
supplemented this work, by some additional measures. The
nurse had cut the plaster of paris cast, but not the bandages
that held the cotton in place within the cast. He cut the
bandages also and partially exposed the leg to the knee or
above. As to the extent of his observation of the patient
from 8 o'clock A. M., until 2:30 o'clock P. M., there is
some conflict in the evidence. He and the nurses say he
visited the patient between those hours, but some of the
relatives of the injured boy, who claim to have been there
all the time, deny that he did so. It seems not to be de-
nied, however, that he was there at 2:30 or earlier. He
and the nurses all swear that, at that time, and not earlier,
the developments of the case made it certain that amputation
would be necessary. What transpired after that time is
substantially set forth in the former opinion.

By instruction No. 1, given at the instance of the plain-
tiff, the jury were told that he was entitled to recover if
they should find that Dr. Hoffman had reason to anticipate
before leaving, that the boy's condition might so develop
as to make amputation of the leg necessary, before his ex-
pected return; that he had not advised the patient's par-
ents or grandparents of the gravity of his condition; that,
by the exercise of reasonable diligence, those in charge of
him would have known, on the morning of November 13,
that amputation was immediately necessary; that one of
his parents or grandparents was in the hospital, throughout
practically all of November 13; that nothing was said to
any of them about the change in the patient's condition,
earlier than 5:30 P. M. and that, from the morning of

November 1, until 5:30 P. M. of that day, gangrene extended from below the knee to a point above the knee.

Whether this instruction erroneously assumes the existence of evidence to prove that Dr. Maxwell, the nurses or any of them could have known on the morning of November 13, 1918, that amputation was immediately necessary, depends upon a partial analysis of the evidence. There is no proof that, at that time, there was any gangrene or any indication thereof, unless it is found in the testimony of Dr. Bell, the family physician, whom Dr. Maxwell called at about 1 o'clock P. M. of the 13th, and who says he saw the boy's leg about an hour later, at which time, it was gangrenous up to the knee and discolored two or three inches above the knee. Upon his knowledge and experience with gangrene and its progress, he expressed an opinion that, if the leg had been in good condition and doing well at 10 o'clock, it could not have been in the condition in which he found it, in the afternoon. He accompanied the boy from the Hoffman Hospital, to a hospital at Cumberland Maryland, in which the amputation took place, at 4 o'clock on the morning of November 14, and saw the condition of the leg at that time, and expressed the further opinion that, in view of its condition then, it could not have been doing well at 10 o'clock A. M. of the 13th. In this, there is no assertion either in terms or by implication, that amputation was immediately necessary in the morning of Nov. 13, or that anybody had reason to know it would become necessary. Dr. Maxwell and the nurses admit unsatisfactoriness of the condition of the patient at that time, but they deny the possibility of determination of the exact cause of the unfavorable symptoms. Between their evidence on this point and that of Dr. Bell, there is no conflict. The latter did not express an opinion that amputation was then necessary, nor that those in charge should have known it would become necessary. From 10:30 A. M., until 2:30 P. M., Dr. Maxwell was endeavoring to ascertain what the outcome would be, if his statements are true, and did not become convinced until about 2:30, when he discovered crepitation signifying the presence of gas-bacillus. He

claims he saw the boy four or five times in the forenoon, left at 1 o'clock P. M., and returning at 2:30, made his discovery, called Dr. Bell and ordered preparation of the operating room. His evidence cannot be interpreted as saying the appearance of the leg then disclosed gangrene to the knee or at all, but he admits he may have told Dr. Bell the patient had developed gas gangrene. Dr. Bell says he told him the leg was gangrenous and would have to come off. The head nurse denies there was any marked discoloration at 1:45 P. M., saying the only change in appearance from ·earlier examinations was a slight increase of the swelling. The discovery of gas-bacillus infection, if made, meant inevitable gangrene, wherefore Dr. Maxwell's message to Dr. Bell may have signified no more than that gangrene was incipiently, but ineradicably, present. His evidence is irreconcilable with the theory of obvious gangrene prior to 3 o'clock. As to the obvious condition of the leg at that time, there may be conflict between the evidence of Dr. Bell on the one hand, and Dr. Maxwell and the nurse, on the other, but this affords no evidence of necessity of amputation on the morning of November 13th, nor any duty respecting it earlier than noon. Dr. Bell may not have seen the leg before 3 o'clock. As to the time, he and Dr. Maxwell are both indefinite. Considerable discoloration may have occurred in the space of three hours, or even in the one hour which he admits intervened between the call for him and his arrival. The experts all agree that gas-bacillus works with unusual rapidity and it may have existed. If it did not, there was no proof of obvious gangrene before noon. If nothing more was discovered at 10:30 o'clock than Dr. Maxwell admits, he pursued the course approved by the experts who testified in the case. He endeavored to restore circulation and awaited such development as would enable him to determine the cause of the trouble. We are of the opinion that there is no evidence upon which the hypothesis of knowledge, actual or constructive of necessity of amputation in the morning of Nov. 13th., can stand.

And there is a total lack of evidence to sustain the hypothesis that Dr. Hoffman had reason to anticipate before

leaving, that any situation would arise, making amputation necessary in his absence. The only two physicians put on the witness stand by the plaintiff, were Dr. Bell, the family physician, and Dr. Johnson of Cumberland, who performed the operation. Neither of them, nor any other expert witness, expressed an opinion that the nature of the wound or circumstances of the case were such as should have generated belief in the mind of Dr. Hoffman, that amputation would become necessary before the time of his expected return. All of the physicians agreed that careful watching was necessary, under the circumstances, and that was provided for in the nurses and Dr. Maxwell. The need of that was the danger of constriction, the result of swelling of the leg. That was anticipated by Dr. Hoffman, in his direction to the nurse to cut the cast on discovery of any swelling. According to the testimony of all the expert witnesses, a sudden development of gangrene, such as took place in the case of this boy, is unusual and unexpected, in the absence of known infection. Ordinarily, a wound of this kind after having been treated as this one was, is not disturbed for several days, and there is no evidence that infection ordinarily develops and progresses so rapidly, as it is shown to have done in this instance. In this connection, the reading of the chart kept by the nurse, as to temperature, pulse and respiration, is invoked. It is said that, if Dr. Hoffman had looked at the chart, he would have discovered in it a reason for greater care and for anticipation of serious results. From midnight, Monday, until noon, Wednesday, the temperature varied considerably. Starting at 99, it rose to 101 at 8 P. M., Tuesday, and then went down to 98, Wednesday, at 8 A. M., and was 99 and 2-5 at noon, Wednesday. The pulse started at 106, rose to 118 and declined to 102 and then went to 124. Respiration started at 24 and went up to 26 and declined to 24. From noon, Wednesday, until 8 P. M., Wednesday, his temperature went to 103.1, pulse to 168 and respiration to 30. Of course Dr. Hoffman could not have known to a certainty that the readings of Tuesday would go down, but the fact that they did, taken in connection with his experience as a surgeon, justified his assump-

tion that they indicated nothing alarming or unusual. Though his testimony and that of the head nurse, to the effect that he saw the boy Tuesday evening, before leaving, is contradicted, there is no evidence of necessity for his presence at that time, or of any condition or symptom that might have occasioned an alteration of his purpose to leave.

Both of the hypotheses of this instruction, to which reference has been made, ignore the provision made for exigencies, in the presence and duties of Dr. Maxwell, and the loose form of the contract. The boy was not put in the special care of Dr. Hoffman, in the first instance. He was put into the hospital and Dr. Hoffman informally and without any special contract hurriedly treated him. The medical and surgical staff consisted of at least three doctors, and there was no stipulation that Dr. Hoffman should give the patient his personal attention at all times, nor that he should not delegate his authority or substitute either of the other physicians. In his absence, the patient was under the general oversight of Dr. Maxwell, an admittedly competent physician and surgeon. To say that a surgeon, even in a critical case, afer having skillfully treated a wound and done all that seemed to be necessary for the time being, may not temporarily substitute a competent associate or assistant, for purposes of oversight and provision against merely possible emergencies, would amount to prescription of a harsh and unreasonable rule. Ordinarily, a physician is unable to devote his entire time to a single patient or to stay within instant call. Upon him as well as other citizens, public duties are imposed and the necessity of his professional services to others renders it impossible at all times to keep in immediate touch with a single patient. Of course, he cannot abandon his patient or neglect necessary attention and treatment. But, if he temporarily provides competent attention and treatment under his personal direction, though not in his presence, there is neither abandonment nor neglect. This seems to have been the opinion of Judge Taft in *Ewing* v. *Goode,* 78 Fed. 442, 449. In this case, however, it is unnecessary to go that far. Dr. Hoffman operated and treated the patient, as one of the staff of the hospital to which he

was sent, and Dr. Maxwell was another member of the same staff. What is assumed in this instruction is evidence of negligence, not in respect of operation or treatment, but in respect of prognosis, diagnosis and provision for emergencies. While the implied covenant was personal and unassignable, such delegation as took place did not amount to an assignment. It was a means or method of performance, such as may reasonably be deemed to have been within the contemplation of the parties, and, therefore, within the contract of employment. In this respect, the case differs from those in which there are complete substitutions by consent of the patient or employer, express or implied, the law of which is declared in *Moore* v. *Lee,* (Tex.) 4 A. L. R. 185 and note. Here there was only a qualified substitution within the provisions of the contract, if any at all.

The subject matter of plaintiff's instruction No. 2 is left in so much doubt by the evidence that the instruction was clearly misleading. It deals with the duty of Dr. Maxwell, on discovery of the necessity of amputation at 2:30 P. M., to give notice thereof to the parents or grandparents of the plaintiff. At that time, the father of the boy was not within reach. A conductor on the Baltimore & Ohio Railroad, he was out on his run. He had left Keyser without having authorized his wife, the grandparents of the child or any other person to receive and act upon such notice. When the mother was finally located, late in the evening, she protested against amputation at that time and demanded that it be postponed until she could communicate with her husband. Failure to notify the grandmother who claims to have been in the hospital throughout the entire day, November 13th., except for one hour between 12 o'clock and 1 o'clock, is the occasion of very severe censure in the argument of the case. Not denying her presence in the hospital early in the afternoon, Dr. Maxwell excuses his failure to notify her, on the ground that she was not authorized to consent to an amputation. She and her husband had practically raised the boy and he made his home with them, but there is no proof that Dr. Maxwell had any knowledge of that situation. The mother also claims to have been at the hospital and in the

boy's room, from 2 or 3 o'clock until 5 or 5:30. During that period, Dr. Maxwell was not in the hospital, at least not about the boy's room. At about 2 or 3 o'clock, Dr. Bell, in response to the summons of Dr. Maxwell, was in the boy's room. Before going there, he had endeavored to locate his parents. Strangely enough, he did not see the mother at the hospital, though she claims to have been there at about the time of his visit. It is probable that she came just after he and Dr. Maxwell left. From this and other evidence, it is apparent that an effort to give notice of the necessity of amputation and to procure consent thereto was made. Although Dr. Bell may not be deemed to have been the agent of the parents, he accepted notice from Dr. Maxwell and endeavored to convey it to the parents. If he was acting for Dr. Maxwell, his testimony, as a witness for the plaintiff, proved an effort to give the notice and to obtain the consent. The duty imposed upon the defendant by the instruction now under consideration, was absolute. The jury were told it was the duty of Dr. Maxwell promplty to inform the parents and grandparents. The import of this is that he was bound to find them and advise them of the situation. The law imposed no duty other than that of reasonable and diligent effort to do so. Dr. Maxwell swears that he took a machine and went to the home of the parents and also of the grandparents in search of somebody authorized to receive notice and give consent. Both he and Dr. Bell swear that the latter, at the instance of the former, made a similar effort. If these efforts had been successful, they would have been unavailing, unless it can be assumed that the mother's position or attitude was different at 3 o'clock, from what it was two and one-half hours later. It does not appear that she could have given consent or obtained authority to do so from her husband, in advance of his return and he did not return until late in the evening, about 9 o'clock. He had left Keyser without making provision for any exigency of any kind, with knowledge of the boy's condition and without inquiry or direction as to his own duty in the premises. At about 11 o'clock on Tuesday morning, he called at the hospital and was told by the nurse that the boy was

doing well. Without having made any further inquiry and without having received any permission or encouragement to absent himself, he resumed his work on the railroad that day and was still pursuing it throughout the next   An instruction which, in view of all these facts and circumstances, imposed absolute duty from the physician promptly to inform parents or grandparents of the necessity of amputation, is clearly misleading and prejudicial. It ignores the evidence of negligence of the parents and futility of notice to them, if it had been given. Except in very extreme cases, a surgeon has no legal right to operate upon a patient without his consent, nor upon a child without the consent of its parent or guardian. *Rishworth* v. *Ross*, 191 S. W. 843; *Mohr* v. *Williams*, 1 L. R. A. (U. S.) 439; *Rolater* v. *Strain*, 51 L. R. A. (U.S.) 880; 30 Cyc., 1577; 21 R. C. L. 392. The complaint in this action however, is not made on account of operation with or without consent, but partly on account of failure to discover necessity for it and give the parents an opportunity to decline or assent. If Dr. Hoffman had been there the father was not on the ground, to give the necessary consent, between noon and 9 o'clock P. M.

Instruction No. 3 given for the plaintiff propounds the hypothesis of liability on the ground of negligence on the part of the head nurse. It told the jury that, if they should find that Dr. Hoffman, knowing the injured leg was so seriously damaged that amputation might reasonably be expected to become necessary at any time after the operation, instructed the nurse, on leaving Keyser for Huntington, to cut the cast and bandages and send at once for Dr. Maxwell, on discovery of development of any unfavorable symptoms, during his absence, and that the nurse failed and neglected to send for Dr. Maxwell, after having discovered interference with circulation, then she was guilty of negligence and the plaintiff was entitled to recover for such injury as resulted. This instruction is based upon proof of failure of the head nurse, to obtain the presence of Dr. Maxwell, immediately upon discovery of the change in the foot. She applied external heat treatment to restore circulation from 7 o'clock until 8. At the latter hour, she and the day nurse

cut the cast and, about that time, she endeavored to summon Dr. Maxwell. His house telephone was not working. She repeatedly tried to get him by means of his office telephone, but did not send a messenger for him. His residence was only about three blocks distant, and he could have been summoned by messenger. Not being able to get him by telephone, she says she awaited his coming, knowing he would be at the hospital in a short time. In this procedure she acted upon her own experience and knowledge and the instruction given her by Dr. Hoffman. A careful search of the evidence fails to reveal any instruction to her to send for Dr. Maxwell at once, or anything else, tending to prove failure on her part to comply with any directions given to her, when fairly interpreted. She was instructed to cut the cast and to relieve from all constriction, if any, on discovery of any swelling of the foot. She swears there was no swelling at 7 o'clock, nor at 8 o'clock, but that she did cut the cast because of the paleness and coldness of the foot, indicating an unfavorable condition. Dr. Hoffman's instruction to her, as found in his testimony, was to send for Dr. Maxwell if necessary. Necessity in point of time depended, under this instruction, upon her judgment and knowledge. In view of the change in condition, she desired Dr. Maxwell's immediate presence and endeavored to obtain it; but, being unable to communicate with him at 8 o'clock and knowing he would be at the hospital in a short time thereafter, she deemed it safe to await his coming, and in the mean time to endeavor to restore or stimulate circulation. She does not admit, nor does any one else testify that it was necessary to have him at once. Another thing to be observed is the fact that, when he arrived, he did not find it necessary to do more than continue the treatment she had applied and elevate the foot. In all this, no evidence of neglect on the part of the nurse is discovered. As she was competent and experienced, there was no negligence on the part of the defendants in relying upon her judgment, in matters properly intrusted to her, and an honest mistake on her part, if made, would not have been negligence, any more than such a mistake on the part of a physician would be. This instruction lacks

foundation in the evidence in two respects, (1), evidence of negligence on the part of the nurse, and (2), injury occasioned by it, if any.

The evidence in this record, respecting the duties and conduct of the nurses, is not materially different from that considered on the former writ of error. In holding it insufficient to justify an instruction framed upon the hypothesis of negligence on the part of the head nurse, we merely repeat a former decision in the case.

Plaintiff's instructions Nos. 4, 5, 6, 11 and 12 are very similar in substance and effect. They all assume the existence of evidence of negligence in attendance, observation, care and treatment, after the wound had been properly dressed. Two of them, 4 and 6, relate to discovery of interruption of circulation, by the exercise of usual and ordinary care and skill, in time to relieve from it and prevent gangrene. Nos. 5 and 11 assume evidence of lack of diligence and care of the patient, to avoid injury. No. 12 assumes evidence of negligence and disobedience of the instructions of Dr. Hoffman. In passing upon other instructions, the contentions as to evidence of negligence on the part of the nurses and Dr. Hoffman have been disposed of. Insufficiency of the testimony of Dr. Bell, to jusitfy an instruction on the theory of negligence in failure to discover necessity of amputation, on Wednesday morning, November 13, has been determined. Only one item of evidence not already considered, is recalled, as having been invoked, upon the theory of lack of diligence on the part of Dr. Maxwell, in respect of detection of the cause of obstruction of circulation and treatment, in the forenoon of November 13. That is his failure entirely to remove the cast from the leg. Fairly interpreted, the evidence of Drs. Miller, Gracie and Harrison, expert witnesses called by the defendant, does not impose such duty under the circumstances disclosed. What they said on the subject was indefinite and constituted only a part of the narration of proper investigation of trouble disclosed by deficient circulation evidenced by paleness and coldness. None of them were asked whether entire removal was necessary, nor did any of them suggest such necessity or a rule requir-

ing it.    Dr. Miller said he would ''Cut off the cast and examine the leg.''    Asked whether he would entirely remove it, he said he might not.    Dr. Gracie said he would ''Split open the cast and examine the wound and leg.'' Asked if he would take off the bandage to see under it, he said: ''Yes, sir, expose the leg carefully so that it can be examined.''    Dr. Harrison said he would remove the dressings, since he could not see through them.    This observation was made with reference to the wound, not the whole leg, and it is apparent from the evidence, that there are wound dressings which form no part of the cast or bandages. A window was left in the cast, through which the wound could be observed and redressed in case of necessity. No expert witness expressed the deliberate opinion that ordinarily careful inspection required complete removal of the cast and bandages. When they are cut from end to end, they can be easily opened sufficiently to allow careful inspection. This claim not only lacks evidence to sustain it, but is actually refuted and its soundness denied by the only expert to whom it was interrogatively suggested.    On this theory of lack of proper diagnosis of the complication discovered on the morning of the second day, it is charged that Dr. Maxwell did not take the patient's temperature.    It had been taken about two and a half hours before he came in and the chart showing it was before him.    He handled the leg and held the boy's hand or arm while he felt the pulse. He could no doubt tell whether any sudden rise of temperature had probably occurred within two or three hours.    Though he did not record the pulse, he took it.    We know of no rule requiring a physician to resort to his medical books, while awaiting the result of treatment and progress of unknown trouble that does not yield to treatment suggested by the symptoms.    The history of the case throughout the preceding night was before the doctor on the nurse's chart. Seeing that, the patient and the unfavorable indications, he could consider them in the light of his technical learning and professional experience, and determine the extent of the data necessary to a proper diagnosis or determination of the stage of development at which a final and correct con-

clusion could be arrived at.     It cannot be assumed that he
did not inspect the wound.     He opened the cast and band-
ages and inspected the leg including the wound.     Being
unable then to determine what the occasion of the trouble
was, he did just what Dr. Harrison said he would do under
such circumstances.     He awaited developments.     Nothing
more can be found in the record, for foundation for these
instructions, than mere surmise or conjecture based upon the
unfortunate final result of the injury.

Plaintiff's instructions Nos. 7 and 10 submitted the hypo-
thesis of negligent failure to discover infection and gan-
grene, until they had so far progressed as to make amputa-
tion at the hip necessary, when it should have been discover-
ed in time to have stopped it at the knee or somewhere be-
low the hip, by amputation.     In support of these instruc-
tions, Dr. Maxwell's failure to notify the grandmother and
mother is invoked.     At the time of admitted discovery of
necessity for amputation,     2:30 P. M. of the second day,
there was no obvious gangrene above the knee, and it is pos-
sible that amputation at the knee or somewhere between it
and the hip would have sufficed.     But the necessary author-
itative assent to amputation at the time could not be obtained.
There is no proof that Dr. Hoffman himself, if present,
would have been permitted to operate.     Dr. Bell, the fam-
ily adviser in medical matters did not advise it, nor offer
to assist in it.     The father was not there to assent and the
mother, if advised at that time would not have assented,
without direction to do so, from her husband who was ab-
sent.     These instructions no doubt rest in some degree
upon the theory of liability on the ground of Dr. Hoffman's
absence.     In that, they have no foundation, as has been
already determined.     These binding instructions     should
have been so qualified as to make liability depend upon a
finding as to legal right in the attending surgeon, to per-
form the operation.     Without such qualifications, they
could not be properly given.

Instruction No. 8 given for the plaintiff was both ab-
stract in form and inapplicable in substance.     It assumed
evidence of abandonment of the patient by this physician

and surgeon.    That nothing of. the kind was involved in the issue has already been held.    Upon the conceded facts, whether an abandonment had occurred was a question for the court, not the jury, and it should not have been submitted to the jury.

The probative value of expert testimony, or rather its relative importance or status, is the subject matter of plaintiff's instruction No. 9, by which the jury were correctly told determination of the issues as to the facts upon which it is founded, is within their province.    But they were further told they should consider it and all other evidence in the case, and give it such weight and credit as they should think it entitled to receive.    They were also advised that the value of such evidence depends·upon the circumstances of each case and that of the circumstances, they must be the judges.    As to purely scientific questions, it is manifest that the testimony of competent experts is entitled to more weight than that of non-expert witnesses.    They are also better qualified to say what facts have material bearing upon intricate scientific inquiries or issues.    As to what is or is not skillful or careful diagnosis or treatment of a wound or disease, extending to and dealing with the entire wound or malady, the testimony of men learned and experienced in medicine and surgery is obviously entitled to greater weight than that of men of no learning or experience in those branches of science.    But these mere facts lying within the vast domain of common knowledge are as well known to jurors as to the courts.    The law assumes honesty, integrity and intelligence on the part of jurors and any attempt to control or direct them as to matters of fact and the probative value thereof is ordinarily an invasion of their province.    The direction to give the expert testimony 'such weight as the jury should think it entitled to implied    no license or right to deny it superior weight in any instance in which they should accord it.    On the contrary, in common sense and logic, if not in terms, they were told to give superior weight to that kind of evidence in so far as they should find justification therefor in reason.    Nor is the observation that the value depends upon the circumstances to

be ascertained by the jury, open to criticism.    The jury are presumed to have known that, in so far as the issue depended upon scientific facts, the expert evidence was peculiarly valuable, and there is nothing in the instructions asserting or implying the contrary, or authorizing them to disregard or disparage it in such instances.    The only authority invoked against the instruction is *Ingwersen* v. *Carr and Grannon,* 164 N. W. 217, which is not applicable.    The instruction disapproved in that case authorized the jury to determine what facts were material as bases of the expert opinions adduced in evidence.    There is no suggestion of such authority in this instruction.    The value of an opinion as evidence depends upon more than relative competency of witnesses, in respect of education and experience.    Integrity and fairness, or the lack thereof, indicated by the demeanor of the witnesses, while testifying, and their relative intelligence indicated by their expressed powers of observation, analysis and reasoning are sometimes very potent in the determination of the value of their evidence.    In some instances, the superiority of one witness over another of the same class is as obvious as that of one class over another; but no right in a court to base an instruction upon such manifest difference is recognized or has ever been judicially suggested so far as we are advised.    The conclusion here expressed is amply sustained by very reputable authority.    *Goodwin* v. *State,* 96 Ind. 550, 569; *Garfield* v. *State,* 74 Ind. 60; *Rivard* v. *Rivard,* (Mich.) 66 N. W., 681; Lawson, Exp. & Op. Ev. p. 182    The instruction just mentioned was properly given.

Lack of evidence justifying the giving of any of the instructions requested by the plaintiff, save No. 9 which did not hypothetically or otherwise authorize any finding, made it the duty of the court to give instruction No. 12 requested by the defendants and refused and also to set aside the verdict for insufficiency of evidence to sustain it, as well as for errors in the refusal of said instruction No. 12 and the giving of erroneous instructions at the instance of the plaintiff.    That instruction, if given, would have directed a verdict for the defendants.    In passing upon the instructions,

all of the evidence and facts relied upon as proof of negligence and abandonment have been carefully examined and considered. It is unnecessary to discuss them further and repeat our conclusions, in the disposition of the assignments of error founded upon the refusal of the peremptory instruction and the overruling of the motion for a new trial.

There was no error in the refusal of instruction No. 13 requested by the defendants. Its subject matter was specifically covered by instruction No. 10 given for them. Refusal of their instruction No. 15 was justified by the giving of two or more others covering its subject matter. Their instruction No. 16, if given, would have required a verdict for them on the sole ground of inability on the part of the jury, to determine whether the gangrene originated from constriction or gas-bacillus. It would have been manifestly misleading, and, besides, the fact hypothetically assumed by it, if found, would not have precluded recovery, if negligence had been proved.

Certain evidence of Mrs. Browning, admitted over objection, should have been excluded. She could not properly testify to her mere understanding from conversation with the head nurse, as to her son's condition. She should have been interrogated as to what the nurse had told her. Whether she knew Dr. Maxwell had any connection with the hospital was immaterial. Not having been at the hospital until Tuesday morning and having had no part in the making of the arrangements for her son's entry into it, she had no personal knowledge of the contract and, therefore, was not competent to say her son had been put under the care of Dr. Hoffman.

There was no error of which the defendants can complain, in the overruling of an objection by the plaintiff, to a question propounded by themselves on cross-examination of the grandmother. Nor is any error perceived in the admission of evidence tending to prove a rule of the hospital, excluding operations therein by others than members of its staff. That rule is one of the relevant facts in the case, even though it may not be very material. Between the dates of the two trials, Mrs. Butler, an aunt of the plaintiff, who

testified on the first trial, left the state and went to another state so far distant as to render it very inconvenient to procure her attendance and rather difficult to obtain her deposition. Her testimony on the first trial, having been preserved, was admitted in the second, over objection. In this ruling, there was no error. 10 R. C. L. p. 966; 16 Cyc. 1096; *Wise Terminal Co.* v. *McCormick*, 107 Va. 376. As the family physician, Dr Bell, was appealed to by the parents of the plaintiff as well as by Dr. Maxwell, when the crisis arose, it was not error to admit his advice, nor to admit his testimony as to what he did and the advice he gave. It was clearly within the discretion of the court to permit the plaintiff to recall a witness, after the defendants had closed their evidence, and propound a question that had been inadvertently omitted, and admit the answer thereto. There was no error in the admission of the expert testimony of Dr. James T. Johnson, the surgeon who amputated the leg, on subjects like and similar to those on which the defendants took such evidence. Mere variance between his testimony in this trial and his testimony in the other, or between it and that of other experts, if any in either respect, did not render it inadmissible. Its weight was for the jury.

Dr. Hoffman should have been permitted to state his custom as to the calling of Dr. Maxwell in his absence, and also to prove the experience of Dr. Maxwell as a surgeon, by his own testimony and the hospital records. All of this evidence tends to prove the degree of care and prudence exercised by him and the reason or ground of the confidence reposed in his assistant and his reliance upon him in important matters. It was error to refuse to let one of the nurses say she had refreshed her memory as to who were in the patient's room, by reference to the bedside chart, kept by the head nurse from information furnished by the witness. *W. Va. Architects and Builders* v. *Stewart*, 68 W. Va. 506. Dr. Littlefield, testifying as an expert, for the defendants, should have been permitted to say that gangrene occasioned by constriction would not ordinarily kill a patient in three or four days. His statement had direct bearing upon the issue as to whether the gangrene was occasioned by constriction or

gas-bacillus, gangrene from the latter cause developing and spreading much more rapidly than that produced by the other, as shown by expert evidence.

It is not our purpose to say that any or all of the errors in admission and rejection of evidence would alone constitute ground of reversal. Many of them were no doubt harmless. The assignments are disposed of for guidance in another trial, if it shall occur. For the other errors noted, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and remanded.*