Emilio Rojas y su Esposa Rosa Cosme, demandantes, apelantes y apelados, *v.* E. D. Maldonado Sierra, demandado, apelado y apelante.

Núm. 9607.—*Sometido:* Abril 6, 1948. *Resuelto:* Mayo 25, 1948.

*E. Martínez Rivera* y *L. Blanco Lugo*, abogados de los apelantes, apelados; *R. Rivera Zayas* y *G. Rivera Cestero*, y *Milton F. Rúa*, abogados del·apelado y apelante.

EL JUEZ PRESIDENTE SEÑOR TRAVIESO emitió la opinión del tribunal.

La demanda en este caso contiene dos causas de acción. Alégase en la primera que los esposos demandantes, padres del niño Rafael Rojas Cosme, de cuatro años y medio de

edad, el día 27 de febrero de 1944, a las 5 p.m., hospitalizaron a dicho niño en la clínica del demandado, para ser allí sometido a un tratamiento de sus amígdalas y adenoides por el Dr. José Picó; y que en la mañana del día siguiente el demandado, inesperadamente y sin el consentimiento y contra la expresa voluntad de los demandantes, "intervino con el cuerpo del menor Rafael Rojas Cosme, en forma y manera desconocida para los demandantes pero con el resultado que dicho menor falleció allí y entonces". La segunda causa de acción se basa en que la intervención del demandado, además de no haber sido consentida por los demandantes, fué negligente, descuidada y sin pericia, causándole así la muerte al menor. Alegando haber padecido intensos sufrimientos y angustias mentales, los demandantes solicitaron se condenase al demandado a pagarles la suma de $20,000, más la de $300 para cubrir los gastos de funerales y entierro, más las costas y gastos y $2,000 para honorarios de abogado.

En cuanto a la primera causa de acción, contestó el demandado negando todas y cada una de sus alegaciones y alegando, como defensa especial, la siguiente:

Que desde el año 1943 el demandado tenía celebrado un contrato con la Asociación de Maestros, de la cual es miembro el demandante, para prestar sus servicios profesionales a los familiares de los maestros acogidos al plan de Clínicas de la Asociación, incluyéndose en dicho contrato toda clase de operaciones y entre ellas las de amígdalas y adenoides; que el día 26 de febrero de 1944 el padre del menor fué a ver al demandado y le manifestó que era su deseo hospitalizar al niño en la clínica del demandado, para que lo operara de las amígdalas inmediatamente por tenerlas en muy mal estado; que el demandante informó al demandado que el niño había sido examinado por el Dr. José Picó, quien opinó que la operación era necesaria y urgente, pero que el Dr. Picó no podría practicar la operación hasta una semana más tarde en el Hospital Presbiteriano en Santurce; que el deman-

dante le manifestó al demandado que tomando en considera-
ción la necesidad urgente de la operación y la economía que
para él representaba el acogerse al plan de la Asociación de
Maestros, él prefería que el demandado le hiciera la opera-
ción al niño, siendo entonces convenido que el niño sería
hospitalizado al día siguiente, para que el demandado pro-
cediera a operarle inmediatamente después de realizarse los
exámenes de laboratorio, si éstos no demostraran alguna
contraindicación que aconsejara la posposición de la opera-
ción; que de acuerdo con lo convenido, el niño fué hospita-
lizado a las 5 p.m. del día 27 de febrero de 1944, y después
de haber sido examinado por el demandado, quien comprobó
la necesidad y urgencia de la operación y de haberse prac-
ticado un examen físico del menor así como de su hemoglo-
bina y tiempo de coagulación de su sangre, exámenes que re-
sultaron satisfactorios, el demandado procedió a practicar
la operación del menor en la mañana del 28 de febrero de
1944, de acuerdo con lo convenido con el demandante y sin
que mediara oposición alguna de la madre del menor, quien
se encontraba presente cuando el niño fué llevado a la sala
de operaciones; que la operación fué efectuada satisfacto-
riamente por el demandado, sin que hubiera hemorragia o
complicación de clase alguna durante la misma, falleciendo
el paciente en el momento en que se le iba a sacar de la sala
de operaciones, como consecuencia de una parálisis bulbar
producida por la anestesia, siendo éste un caso desgraciado,
sin que mediara negligencia o descuido alguno de parte del
demandado o de sus empleados.

Negó el demandado todas las alegaciones de la segunda
causa de acción y como defensa especial alegó, además de
lo expuesto en cuanto a la primera causa de acción, que la
operación fué efectuada por el demandado con la debida pe-
ricia y diligencia tomando todas las precauciones aconseja-
bles en casos de esa naturaleza y que el fallecimiento del
menor sobrevino después de ser operado satisfactoriamente,

sin que en manera alguna pueda imputarse al demandado negligencia, descuido a falta de pericia.

La corte inferior dictó sentencia declarando con lugar la primera causa de acción, por haber el demandado "operado al niño Rafael Rojas Cosme, sin consentimiento de sus padres y haberle sobrevenido a dicho menor la muerte por causa de dicha operación" y condenando al demandado a pagar a los demandantes la suma de $5,000 "por angustias mentales y morales y sufrimientos físicos", más las costas y $500 para honorarios de abogado. En la sentencia no se hizo pronunciamiento alguno en cuanto a la segunda causa de acción. Empero, en la opinión emitida como base de la sentencia, el tribunal hizo constar que a su juicio la prueba era insuficiente para sostener la alegación de negligencia y falta de pericia por parte del demandado.

Solicitaron los demandantes la reconsideración de la sentencia y su modificación en el sentido de aumentar el importe de la indemnización concedida por "las angustias y los sufrimientos físicos y mentales padecidos por los demandantes". Alegaron los demandantes que seguramente al fijar la indemnización el tribunal sólo tuvo en mente el elemento de compensación a los sufrimientos físicos y morales de los demandantes, "y no se detuvo a considerar que dentro de la condición de inflación porque atraviesa Puerto Rico, estos $5,000 quedan reducidos en su valor adquisitivo y en comparación con el valor del dólar en época normal, a escasamente dos mil dólares ($2,000)". Declarada sin lugar la reconsideración solicitada, apelaron los demandantes por no estar conformes con la sentencia "en cuanto por la misma se desestima la segunda causa de acción ejercitada y se tasan los daños y perjuicios concedidos al declararse con lugar la primera causa de acción en la suma de $5,000 y se fijan los honorarios de abogado en $500." Apeló también el demandado.

1. Consideraremos en primer término el recurso inter-

puesto por el demandado, el cual se basa en cuatro señalamientos de error, los cuales consideraremos conjuntamente.

Alega el demandado apelante que la corte inferior erró al declarar con lugar la primera causa de acción, después de haber llegado a la conclusión de que no se probó que el niño falleciera a consecuencia de acto alguno de culpa o negligencia del demandado, no existiendo, por lo tanto, relación de causa y efecto entre el alegado hecho de operar sin el consentimiento y el fallecimiento del niño.

La primera causa de acción no se basa en que el demandado al practicar la operación del menor actuara negligentemente o sin tener la pericia requerida para poder efectuarla con éxito. Se basa exclusivamente en el alegado hecho de que el demandado intervino con el cuerpo del menor y practicó la operación sin el consentimiento y en contra de la voluntad expresa de sus padres, con el fatal resultado de que el niño falleció como consecuencia de la operación.

La contención del demandado apelante es, en síntesis, que de acuerdo con nuestras leyes un cirujano, que sin el consentimiento y en contra de la expresa voluntad de un paciente somete a éste a una operación, no es responsable por la muerte del paciente como consecuencia de tal operación, a menos que de la prueba resulte que el cirujano carecía de la pericia necesaria para realizarla con éxito o que actuó negligentemente. Sostienen los demandantes que la falta de consentimiento del paciente—o el de los padres cuando se trata de un menor—es por sí sola suficiente para hacer responsable al cirujano de todas las consecuencias de su intervención con el cuerpo del paciente, sin que sea necesario alegar y probar que el cirujano carecía de pericia o que actuó sin el debido cuidado.

Para la resolución de la cuestión así planteada conviene hace constar que la corte sentenciadora, después de hacer un detenido análisis de toda la evidencia, declaró como hechos probados, los siguientes:

1. "Que el Dr. E. D. Maldonado no tenía autorización ni del padre ni de la madre para operar al niño ya que el niño fué hospitalizado para ser operado por el Doctor Picó y el Doctor Maldonado confundió la solicitud de hospitalización con la solicitud de servicio quirúrgico".

2. "Que el Doctor Maldonado no verificó ningún examen físico del niño el domingo por la tarde ni por la noche."

La evidencia en cuanto a los referidos hechos es contradictoria. Pero siendo la aducida por los demandantes y creída por la corte, ampliamente suficiente para sostener las conclusiones a que nos hemos referido, es nuestro deber respetarlas.

██ De conformidad con nuestro Código Civil, "de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia", nace la obligación de reparar el daño causado. Artículos 1042, 1046 y 1802 del Código Civil, ed. 1930. El artículo 60 del Código de Enjuiciamiento Civil, ed. 1933, concede a los padres el derecho a entablar demanda por el daño causado a un hijo menor de edad, o por la muerte de éste, "cuando dicho daño o muerte se deba al acto ilegal o negligencia de otro."

En sus Comentarios al Código Civil Español, refiriéndose a las obligaciones que se contraen sin convención y especialmente a las que provienen de culpa o negligencia, dice Manresa:

"Fúndanse dichas obligaciones en un principio indiscutible de justicia, reconocido por todas las legislaciones . . ., según el que todo agravio, todo daño, o todo perjuicio que reciba una persona en sus derechos, ya sea por acción ya por omisión, crea una relación jurídica de la que se deriva el derecho que tiene el agraviado a ser indemnizado, y la obligación consiguiente por parte del agraviante.

"" *             *             *             *             *             *             *

"Según el Código, pueden provenir de dos causas diferentes, que son: la culpa y la negligencia, es decir, que pueden contraerse por acción y por omisión, *pues la culpa requiere la ejecución de un acto positivo que cause un perjuicio a otra persona distinta de la que*

*le llevó a cabo*, y a su vez la negligencia supone una omisión que produzca el mismo efecto, si bien ambas tienen de común el que el acto se ejecute o se incurra en la omisión sin intención nociva, pues si no faltase dicho elemento, si el acto o la omisión citados obedecieran a una intención dañosa, entonces vendrían a convertirse en verdaderos delitos o faltas, según los casos, y producirían las responsabilidades penales y civiles correspondientes . . . . Cuando no llegan a efectos tan graves la culpa o la negligencia, producen sin embargo obligación civil, limitada a reparar el daño causado por medio de su indemnización. . . .

"El hombre, ha dicho un autor, debe subordinar todas sus acciones a las reglas y preceptos de la prudencia; y si por obrar de una manera contraria a ella causa un mal a la persona o bienes de un extraño, debe repararle en lo posible. Fué el causante del daño, aunque sin intención, y por tal motivo viene obligado a indemnizar debidamente al que por su causa sufrió el perjuicio. He aquí la obligación nacida de la culpa que no llega a constituir delito o falta.

*        *        *        *        *        *        *

"Es decir, que *la idea de la culpa*, según dice el Sr. Sánchez Román, *lleva consigo la de la contradicción voluntaria de un derecho ajeno con la cual se causa perjuicio, daño u ofensa a aquel a cuyo patrimonio jurídico pertenece el derecho indicado;* pero esa violación del mismo, causante del daño o perjuicio, ha de ser independiente de toda convención anterior y por eso ha sido conocida esta culpa con el nombre de *extracontractual*. En cambio, en la negligencia no hay acto positivo alguno del responsable de la misma, ni hay voluntad activa ni intención, sino meramente una omisión de los deberes de prudencia, de previsión, de vigilancia que la ley le impone." T. 12 (2da. ed. 1911) págs. 607 a 609. (Bastardillas nuestras.)

Más adelante, en el mismo tomo 12, página 613, en sus Comentarios al artículo 1902 del Código Civil Español, equivalente al 1802 del nuestro, dice Manresa:

"El precepto que examinamos se funda en un principio de equidad indiscutible, y la regla en él establecida constituye una máxima de jurisprudencia universal, pues la culpa no puede perjudicar más que a su autor, y en ningún modo debe soportar las consecuencias de ella quien sin voluntad, ni causa alguna por su parte, es víctima de los resultados de la misma o sufre los perjuicios originados por ella."

Vemos, pues, que la obligación de reparar el daño causado a otra persona puede provenir de la mera ejecución de un acto positivo e ilícito, sin que sea necesario alegar y probar que el causante del daño actuó sin la debida prudencia o sea negligentemente.

¿Cuál fué el acto positivo e ilícito realizado por el demandado? El de haber operado al niño sin el consentimiento y en contra de la expresa voluntad de sus padres. Estos tenían el derecho de elegir el cirujano en cuyas manos iban a entregar la salud y la vida de su hijo. El demandado no tenía, por el solo hecho de ser médico autorizado para el ejercicio de la medicina y de la cirugía, derecho alguno para intervenir con el cuerpo del niño y practicar la operación sin el previo consentimiento de sus padres. Al intervenir y practicar la operación que había de practicar el Doctor Picó, sin obtener previamente el consentimiento de los padres del menor, el demandado realizó un acto positivo e ilícito que envolvía la contradicción voluntaria e inexcusable del derecho que tenían los padres demandantes a elegir el cirujano que había de operar al niño. Al actuar sin la autorización de los padres, o sea ilícitamente, el demandado incurrió en culpa extracontractual o aquiliana, se hizo responsable de las consecuencias de sus actos y quedó legalmente obligado a reparar el daño causado.

Convenimos con la representación del demandado apelante y con los numerosos tratadistas por ellos citados, en que para que prospere una acción de daños y perjuicios es necesario que exista relación de causalidad entre el daño o perjuicio y la falta del agente. La prueba creída por la corte sentenciadora demuestra la existencia de esa relación en el presente caso, pues no cabe dudar que el niño no hubiese perdido su vida el día 28 de febrero de 1944 a no ser por la ilícita intervención del demandado. La situación sería distinta si la muerte hubiese ocurrido bajo la intervención del Doctor Picó, quien había sido contratado y autorizado para operar al niño, pues en ese caso el cirujano es

responsable solamente en el caso de que la muerte fuere ocasionada por su negligencia o falta de pericia.

La regla general sentada por la jurisprudencia de los estados americanos es al efecto de que siendo la relación de médico y cliente de naturaleza consensual, en ausencia de una emergencia o de condiciones imprevistas un médico o cirujano debe obtener primeramente el consentimiento del paciente, o el de alguna persona legalmente autorizada para darlo en su nombre, antes de someterle a un tratamiento o a una operación. Se ha sostenido que el consentimiento del paciente es necesario para autorizar al cirujano a practicar una operación en el cuerpo de aquél y que una operación practicada sin tal consentimiento es un acto torticero e ilegal que hace responsable al cirujano por los daños causados al paciente.[1] En *Moss* v. *Rishworth*, 222 S.W. 225 (Tex. 1920) una niña fué operada de las amígdalas y adenoides y murió como consecuencia de la operación, la que fué practicada sin consultar al padre de la menor. El médico demandado alegó que él había sido autorizado por dos hermanas de la niña y que asumió que éstas estaban facultadas para dar el consentimiento para la operación. Se resolvió:

"Las hermanas no eran más que las guardianes temporeras de la niña y como tales no tenían autoridad para dar el consentimiento para la operación, en ausencia de una emergencia. El padre era el único que podía legalmente dar el consentimiento para la operación, y, si no lo dió, el acto del médico al practicarla fué contrario a la ley. Si la operación fué hecha sin el consentimiento del padre, ello equivaldría a una agresión técnica por la cual la niña tendría derecho a reclamar daños y perjuicios si hubiese sobrevivido la operación. . . . La ley sabiamente ha confiado al padre el cuidado y custodia del hijo menor, y ni al médico ni a los que tengan al menor temporalmente bajo su custodia se les permitirá, en casos de esta naturaleza, resolver estos asuntos que afectan el bienestar del menor."

[1] Anotaciones en: 41 Am. Jur. pág. 220, sec. 108; 76 A.L.R. 562; 50 L.R.A. (N.S.) 880; *Wall* v. *Brim*, 138 F.2d 478 (C.C.A. 5, 1943) *In re Hudson*, 126 P.2d 765 (Wash. 1942); *Jackovach* v. *Yocom*, 237 N.W. 444 (Iowa, 1931).

Véanse: *Hively* v. *Higgs,* 120 Or. 588 (1927), 53 A.L.R. 1052; *Browning* v. *Hoffman,* 90 W. Va. 568 (1922), 111 S. E. 492 (W. Va., 1922).

No erró la corte inferior al declarar con lugar la primera causa de acción.

2. Consideraremos ahora el recurso interpuesto por los demandantes. Se basa éste en nueve señalamientos de error, los cuales pueden reducirse a los tres siguientes:

(1) Al negarse a declarar con lugar la segunda causa de acción.

(2) Al no condenar al demandado al pago de los gastos de funerales y entierro del niño.

(3) Al conceder a los demandantes una idemnización de solamente $5,000, más $500 para honorarios.

■ (1) No creemos necesario hacer una exposición detallada de la prueba aducida por los demandantes para sostener la alegada segunda causa de acción. La corte inferior, que vió y oyó declarar a los testigos, después de hacer un minucioso resumen de toda la evidencia tendiente a establecer la negligencia o falta de pericia del demandado, llegó a las conclusiones siguientes:

(*a*) "Nada hay en la técnica operatoria empleada por el doctor Maldonado, en lo cual los peritos están contestes, . . . que nos dé base para poderle imputar ninguna negligencia quirúrgica"; y "nada hay en la prueba que nos permita llegar a la conclusión que el examen personal que hizo el cirujano contraindicara en forma alguna la operación."

(*b*) "Queda siempre en el ánimo del juzgador si en realidad en este desgraciado caso del niño Rojas, no habría cierta condición fisiológica especial que lo hiciera víctima propiciatoria del anestésico en sí, o que sea éste uno de los casos en que por un misterio de la naturaleza humana, el niño haya muerto por un factor que no hubiera podido

determinarse a través del examen de laboratorio o de la exploración del paciente.''

(*c*) ''No podemos, pues, llegar a la conclusión de que el niño Rojas en este caso muriera por ningún acto de negligencia, falta de pericia, o descuido inexcusable del cirujano que intervino en la operación.'.'

Tras un detenido estudio de la transcripción de la evidencia opinamos que las anteriores conclusiones en cuanto a la segunda causa de acción están justificadas ,y, por lo tanto, que no erró la corte inferior al declarar sin lugar la segunda causa de. acción.

■ (2) ,La prueba ofrecida por los demandantes en · cuanto a los gastos de funerales y entierro del niño, aun cuando pudo haber sido más clara y específica, es a nuestro juicio suficiente para justificar una indemnización por ese concepto. Declaró el demandante que él había gastado ''poco más o menos como $300'' en los funerales, entierro y velorio del niño; que pagó el carro fúnebre, por llevar el cadáver desde Río Piedras a Corozal, y pagó la caja y la tumba y por cavar la sepultura; que no recogió recibos por esos gastos. Esa prueba no fué controvertida por el demandado, ni aparece del récord que no le mereciera crédito a la corte sentenciadora. Erró ésta al no condenar al demandado al pago de esos gastos o por lo menos, una suma razonable, si a su juicio la reclamada era excesiva.

■ (3) Los demandantes impugnan, por considerarla insuficiente, la indemnización de $5,000 concedida por la primera causa de acción. Arguyen que la corte inferior erró por no haber tomado conocimiento judicial del estado de inflación existente en la fecha de la sentencia, por virtud del cual ''el poder adquisitivo del dólar había bajado a tal punto que para adquirir lo que en 1939 podía comprarse con un dólar, se requerían entonces $2.04.'' Alegan que el valor adquisitivo de los $5,000 concedidos es de solamente $2,500.

La intención justa y humana de la ley es conceder una compensación suficiente a la persona a quien se ha causado un daño. Esa compensación debe tener un valor real y efectivo y no un valor ficticio. Por eso no puede decirse que una cantidad determinada sea compensación suficiente, lo mismo cuando el dinero está barato que cuando está caro. Teniendo en cuenta que el dólar como unidad de medida de los valores es una medida imperfecta y fluctuante, los economistas han ideado una unidad de medida, que aunque también es imperfecta, es más exacta que el dólar para medir los valores. Esa unidad de medida es el poder adquisitivo del dólar, el cual se determina tomando como base el costo en dinero de las cosas esenciales para la vida, tales como los alquileres, vestidos, alimentos y combustibles durante un período de tiempo determinado, para compararlo con el costo en dinero de esas mismas necesidades durante un período anterior de igual duración. Esto demuestra que el valor real y efectivo del dinero no es el dinero mismo y sí lo que por ese dinero se puede adquirir.

Aplicando esos principios al caso bajo su consideración, la Corte Suprema de Missouri, en *Hurst* v. *Chicago, B. & Q. R. Co.*, 219 S. W. 566 (Mo. 1920), se expresó así:

"Resulta, que si $10,000 era una justa compensación en valor por tales daños como los aquí envueltos, hace veinte años, cuando el dinero estaba caro, se requerirá una suma mayor ahora que el dinero está barato y su poder adquisitivo es pequeño. Cuánto mayor debe ser esa suma dependerá de la diferencia en valor (es decir, poder adquisitivo) del dinero, ahora y entonces. Que el dinero tiene hoy un poder adquisitivo mucho menor que el que tenía hace veinte o aún diez años, no admite discusión, y no estaríamos justificados si dejásemos de tomar conocimiento judicial de una situación mundial, vista y conocida por todos los hombres en todas partes. Siendo esto cierto, si nosotros concedemos hoy las mismas cantidades de dinero que concedíamos en igualdad de circunstancias hace diez o veinte años, entonces estamos siguiendo nuestras decisiones de aquellos días en su letra, pero separándonos de ellas en espíritu."

Véanse: *Rafael Meléndez Arroyo* v. *Metro Taxicabs Co.*, ante, pág. 766; *Washington & Rockville R. Co.* v. *La Fourcade*, 48 App. D.C. 364 (1919); *Eckels* v. *Edison*, 139 Ill. App. 75, 81; *Cross* v. *Lee Lumber Co.*, 130 La. 66, 57 So. 631; *Dole* v. *New Orleans Ry. & Light Co.*, 121 La. 945, 46 So. 929; *Rogers* v. *Hiram J. Allen Lumber Co.*, 129 La. 900, 57 So. 166.

Tomando en consideración la situación económica prevaleciente en la fecha en que se dictó la sentencia recurrida y el actual bajo poder adquisitivo del dólar, opinamos que la suma de $5,000 concedida a los demandantes por los sufrimientos físicos y morales con motivo de la inesperada y trágica muerte de su hijo, no es una compensación suficiente y que la misma debe ser aumentada.

*La sentencia recurrida será modificada en el sentido de condenar al demandado a pagar a los demandantes la suma de $10,000 por las angustias mentales y morales y sufrimientos físicos, más la suma de $200 como gastos de funerales y entierro del niño, más las costas y $1,000 para honorarios de abogado. Y así modificada, será confirmada.*

El Juez Asociado Sr. De Jesús no intervino.